Inez **CURRY**, Remer Curry, Emory C. Mills, Margaret T. Mills, Billie R. Collins, Andrew Covin, and Lannis H. Morrell on behalf of themselves and all others similarly situated, Plaintiffs,

v.

John **BLOCK**, Individually and in his capacity as Secretary of the United States Department of Agriculture; H. Allan Brock, Individually and in his capacity as Deputy Administrator of FmHA Farm and Family Programs; Orson G. Swindle, III, Individually and in his capacity as State Director for Georgia, Farmers Home Administration, United States Department of Agriculture; and William J. Holley, Individually and in his capacity as District Director Farmers Home Administration, United States Department of Agriculture, Defendants.

Civ. A. No. CV 281–37.

United States District Court,
S. D. Georgia,
Brunswick Division.

June 11, 1982.

that caused incompetent representation by a public defender. 102 S.Ct. at 454.

Holle Weiss-Friedman, Brunswick, Ga., Martha A. Miller, John L. Cromartie, Jr., Atlanta, Ga., for class action plaintiffs.

Melissa S. Mundell, Savannah, Ga., Ted L. Elders, Atlanta, Ga., for defendants.

Garland T. Byrd, Charles W. Byrd, Butler, Ga., Denmark Groover, Jr., Macon, Ga., Robert Rosenblum, Waycross, Ga., for intervenors.

### ORDER

ALAIMO, Chief Judge.

## I. INTRODUCTION

Plaintiffs, acting on their own behalf and on behalf of a class defined as:

> "all persons in Georgia who have farm operating, ownership, or emergency loans financed under the Consolidated Farm and Rural Development Act, P.L. 87–128, whose loans were, are, or will be held by the Farmers Home Administration of the United States Department of Agriculture, and whose farm loans have been foreclosed, are in foreclosure, are threatened with foreclosure, or shall be foreclosed upon or threatened with foreclosure,"

have brought this action seeking declaratory and injunctive relief in a challenge to the procedures used by the Farmers Home Administration (FmHA) in implementing a 1978 amendment to the Consolidated Farm and Rural Development Act entitled "Loan moratorium and policy on foreclosures." 7 U.S.C. § 1981a (1982 Supp.). Specifically, the plaintiffs seek a declaration by the Court that the members of the class must be given *personal notice* of the availability

of deferral relief under § 1981a and must be granted the opportunity to apply for the same before any acceleration action is commenced. Plaintiffs also pray that the Court enjoin the defendants from foreclosing on the applicable FmHA loans without first providing the borrowers with personal notice of and an opportunity to apply for § 1981a deferral relief. A declaration is also sought that the FmHA has a duty to promulgate regulations implementing § 1981a consistent with the underlying Congressional intent. Further, plaintiffs ask the Court to enjoin the failure of the FmHA to promulgate these regulations. Finally, plaintiffs seek an Order enjoining the defendants from foreclosing on all consolidated rural housing and farm loans until they have complied with a consent Order entered in a similar case. *See Williams v. Butz*, No. 176–153 (S.D.Ga. Oct. 7, 1977). In that case, the FmHA agreed to provide certain rural housing program borrowers with personal notice of the availability of moratorium relief under the Rural Housing Act, 42 U.S.C. § 1475 (that Act's functional equivalent of § 1981a). Plaintiffs claim that the refusal of the FmHA to provide *consolidated* farm and rural housing borrowers with the rights due to rural housing borrowers (personal notice of moratorium rights) violates the *Williams v. Butz* consent Order.[1]

## II. FACTUAL BASIS

The named plaintiffs and the class they represent are farmers in rural Georgia. One way or another, each of them has become eligible for and received agricultural credit through the FmHA under the Consolidated Farm and Rural Development Act. 7 U.S.C. §§ 1921 *et seq.*

It is apparent that most if not all of these farmers began experiencing financial difficulty in 1977 due in large part to adverse weather and economic conditions. As a result, the farmers have found it desirable to maximize their use of loan servicing devices and have attacked the FmHA's implementation of § 1981a.

At this point in the litigation, it is clear that the only real issue between the parties is legal in nature. Accordingly, the parties have filed extensive cross-motions for summary judgment, and the case is now ready for final adjudication.

## III. BACKGROUND

The legal issue in this case basically involves the interpretation and construction of a section of a Congressional enactment—section 1981a. In such situations, it is "the conventional judicial duty to give faithful meaning to the language Congress adopted in light of the evident legislative purpose in enacting the law in question." *United States v. Bornstein*, 423 U.S. 303, 310, 96 S.Ct. 523, 528, 46 L.Ed.2d 513 (1976). Thus, a cursory review of the history of federal involvement in agricultural credit through 1978, and a summary of the statutory and regulatory framework, are necessary to aid this Court in determining the legislative purpose.

### A. *History of federal involvement in agricultural credit*[2]

The federal government has been involved in extending agricultural credit for some 120 years. The first such involvement was initiated in 1863 with the passage of the Homestead Act; an act designed to provide farming opportunities for small-scale, family farmers—still a goal for federal intervention in agricultural credit. Although this aspect of federal involvement remained basically the same over the next 72 years, credit to farmers was also made available through the Federal Land Banks (1916), the Federal Intermediate Credit

---

**1.** The plaintiffs have filed a six count complaint alleging multiple bases for the various claims of relief. This summary of the cause of action, however, constitutes the gist of the remedies desired by the plaintiffs in this case. It is on these broad issues that the Court will concentrate in deciding this case.

**2.** The Court appreciatively draws upon the material contained in the briefs submitted by the parties as a source for some of the information to follow.

Banks (1923), and the Banks for Cooperatives (1933). The federal government was also making "natural disaster" loans available pursuant to a presidential directive issued in 1918 in response to a severe drought.

Then, in 1935, the earliest predecessor to the FmHA, the Resettlement Administration, was created by Executive Order. This agency was authorized to make small loans to farmers with the goal toward helping families settle in the rural areas. Soon thereafter, Congress again entered the agricultural credit market, this time by passing the Bankhead-Jones Farm Tenant Act of 1937. This Act created the Farm Security Administration to administer a program of supervised, long-term farm ownership loans to be made to farmers without alternative credit sources—a basic duty of the present-day FmHA. Thus, the concepts of the present farm loan programs are rooted in that mass of social legislation arising out of the Depression years.

The Bankhead-Jones Farm Tenant Act of 1937 was reenacted in 1946 as a part of the Farmers Home Administration Act of 1946. This latter Act did not change the nature of federal involvement in agricultural credit; instead it was enacted "to simplify and improve credit services to farmers and promote farm ownership." [1946] U.S.Code Cong.Service 1028. As implied by its title, the act abolished the ten year old Farm Security Administration and replaced it with the Farmers Home Administration.

Fifteen years after the Farmers Administration Act of 1946 was passed, changing conditions in the agricultural section of this country forced Congress to update its program for agricultural credit:

"[T]he revolution occasioned by the mechanization of farming operations generally, the change in character and extent of resources necessary to successful operation of family farms, and the increase in farming technology have made tremendous differences in the credit needs of farmers. While amendments have been made since 1946 to modify the Secretary's lending authority as these changes were taking place, many of the provisions of earlier loans have ceased to serve their initial purpose and are unworkable as a basis for a Federal supplement to the financing of our Nation's agricultural production."

[1961] U.S.Code Cong. & Ad.News 2243, 2306. As a result, Congress passed the Consolidated Farmers Home Administration Act of 1961 (as Title III of the Agricultural Credit Act of 1961). The Act, in response to the "increase in farming technology" and the "tremendous differences in the credit needs of farmers," was designed as "a consolidation and modernization of the Secretary's authority to make available to eligible farmers who cannot obtain credit elsewhere direct and insured loans necessary to finance their acquisition, improvement and operation of farms." *Id.* at 2305. Thus, the 1961 Act placed under one more modern roof the already existing authority of the Secretary to loan money for three purposes—real estate acquisitions and improvement (Subtitle A), operating expenses (Subtitle B) and emergencies (Subtitle C).

Contemporaneously with its intervention in the farmer program loans, the federal government was also involved in extending credit, through the FmHA, to farm owners to enable them to construct, improve, alter or repair their farm dwellings. *See* 42 U.S.C. § 1471, 63 Stat. 432 (1949). This program was a part of the Congressional action on a national housing policy designed to assist in the "elimination of substandard and other inadequate housing . . ., and the realization of the goal of a decent home and a suitable living environment for every American family." The Housing Act of 1949, 63 Stat. 413, 413 (1949).

In 1972, the farmer loan program and the rural housing loan program were consolidated through an amendment to the Consolidated Farms Home Administration Act of 1961. This amendment changed the name of the 1961 Act to the Consolidated Farm and Rural Development Act and adopted provisions relevant to Rural Housing loans. It did not, however, change the nature of

the farmer loan program; thus this program stands today basically as it has for almost half a century.

In summary, federal intervention in agricultural credit shows a long history of farmer loans designed to aid the family farmer who cannot obtain credit from a different source. Thus, as with most programs spawned in the Depression years (the roots of todays program lie in the Bankhead-Jones Tenant Act of 1937 and not the Homestead Act of 1863), the object of the legislation is to aid the "underprivileged" farmer, and is therefore a form of social welfare legislation.

B. *The Statutory and Regulatory Framework*

The Consolidated Farm and Rural Development Act as it existed in 1978 (and presently) is divided into four subtitles. The first three subtitles contain the substantive provisions of the Act while the fourth contains the administrative provisions.

Subtitle A, headed "Real Estate Loans," authorizes the Secretary to make or insure loans to eligible persons "for (1) acquiring, enlarging, or improving farms, including farm buildings, land and water development, use and conservation, (2) recreational uses and facilities, (3) enterprises needed to supplement farm income, (4) refinancing existing indebtedness, and (5) loan closing costs." 7 U.S.C. § 1923(a). Those persons eligible for these loans include "family farmers" unable to obtain sufficient credit elsewhere. 7 U.S.C. § 1922. To insure repayment, the Secretary is directed to take such security interest (generally the land) "as he may determine to be necessary." 7 U.S.C. § 1927.

Subtitle B, headed "Operating Loans," authorizes the Secretary to make or insure loans to eligible persons for, *inter alia*, "(1) paying costs incident to reorganizing the farming system for more profitable operation, (2) purchasing livestock, poultry, and farm equipment (including equipment which utilized solar energy), (3) purchasing feed, seed, fertilizers, insecticides, and farm supplies and to meet other essential farm operating expenses including cash rent, . . . (7) refinancing existing indebtedness . . ." 7 U.S.C. § 1942. Those persons eligible for these loans, as with Subtitle A, include operators of "family farms" unable to obtain sufficient credit elsewhere. 7 U.S.C. § 1941. The Secretary has the discretion to make these loans "upon the full personal liability of the borrower upon such security as the Secretary may prescribe." 7 U.S.C. § 1946(a)(1). The Secretary is further authorized to consolidate or reschedule outstanding loans. 7 U.S.C. § 1946(b). Interestingly, the conditions under which the consolidation or rescheduling can occur are not prescribed by statute.

Subtitle C, headed "Emergency Loans," authorizes the Secretary to make and insure loans where the applicant's operations "have been substantially affected by a natural disaster in the United States or by a major disaster or emergency designated by the President under the Disaster Relief Act of 1974." 7 U.S.C. § 1961(a). Loans can also be made based on extreme production losses. 7 U.S.C. § 1970. The emergency loans can be made for any purpose consistent with Subtitle A or Subtitle B, 7 U.S.C. § 1963. The persons eligible for these emergency loans, unlike under Subtitle A and Subtitle B, include those able to obtain credit elsewhere,[3] although it is apparent that there must be a "reasonable prospect for successful operation with the assistance of such a loan." 7 U.S.C. § 1961(a)(b). Again, the Secretary is directed to try to insure repayment by taking adequate security interests. Loans are made "upon the full personal liability of the borrower and upon the best security available . . . . Pro-

---

3. For those able to obtain sufficient credit elsewhere, however, "three years after the loan is made or insured, and every two years thereafter for the term of the loans, the Secretary shall review the loan; and if . . . the borrower is able to obtain a loan from non-Federal sources at reasonable rates and terms . . ., the borrower shall on request by the Secretary, apply for and accept such non-Federal loan in sufficient amount to repay the Secretary." 7 U.S.C. § 1964(d).

vided that the security is adequate to assure repayment of the loans, except that if such security is not available because of the disaster, the Secretary shall (1) accept as security such collateral as is available, . . . together with the Secretary's confidence in the repayment ability of the applicant." 7 U.S.C. § 1964(d).

Subtitle D, headed "Administrative Provisions," outlines the various procedures to be used by the Secretary in implementing the three loan programs and supplies miscellaneous grants of authority. For example, one section authorizes the creation of national, area, state and local offices to aid in administration. 7 U.S.C. § 1981(a). For the purposes of this case, however, only two sections are relevant. Section 1981(d) provides the source authority for many of the loan servicing devices used by the FmHA and provides that "[t]he Secretary may . . . (d) compromise, adjust, or reduce claims, and adjust and modify the terms of mortgage, leases, contracts and agreements entered into or administered by the Farmers Home Administration under any of its programs, as circumstances may require, . . ." 7 U.S.C. § 1981(d). The other section, § 1981a, the interpretation of which is the subject of this litigation, provides in pertinent part:

> "In addition to any other authority that the Secretary may have to defer principal and interest and forego foreclosure, the Secretary may permit, at the request of the borrower, the deferral of principal and interest on any outstanding loan made, insured or held by the Secretary under this chapter, or under the provisions of any other law administered by the Farmers Home Administration, and may forego foreclosure of any such loan, for such period as the Secretary deems necessary upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower

is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrowers." 7 U.S.C. § 1981a. A comparison between § 1981a and § 1981(d) reveals important differences. First, the fact that the former establishes authority "in addition to any other authority . . . to defer principal and interest and forego foreclosure," necessitates the conclusion that § 1981a provides a loan servicing mechanism above and beyond that provided for in § 1981(d). Second, and more importantly, while § 1981(d) contains broad language of discretion—"as circumstances may require" [4]—§ 1981a contains no such provision. In fact, § 1981a lists eligibility criteria that must be met before the deferral benefits of that section can be enjoyed. The importance of these differences will become apparent later.

Beyond this statutory framework, there are certain administrative regulations placing obligations on the FmHA. For example, a major obligation of the FmHA is to provide "management assistance to individual borrowers and applicants." 7 C.F.R. Part 1924, Subpart B. This assistance, which includes credit counselling, planning, recordkeeping, supervision, review and evaluation, is designed to assist the FmHA borrower to move in a positive direction toward a better financial position so that he may no longer require government agricultural credit.

While "management assistance" regulations tend to indicate that the loan program is a form of social welfare legislation, the extensive regulations governing security interests are a reminder that the government has become a lending institution desirous of receiving adequate repayment of its loans. Without recounting the regulations governing security interests, it is sufficient to note

---

4. It should be noted that § 1981(d)(1) to (5) provides some limitations on the Secretary's discretion to compromise, adjust or reduce claims and mortgages. These limitations, however, are designed to insure that the "serviced" loans remain adequately secured, that the Secretary has guidance where the borrower has transferred the security, that the Secretary use the expertise of the county offices and that the Secretary does not proceed on claims made uneconomical due to a small outstanding balance owed. The discretionary nature of the Secretary's authority under this section remains uninhibited.

that these regulations cover farm ownership loans, operating loans, emergency loans and the disposition of security.

The FmHA has also promulgated regulations discussing the use of loan servicing devices. For the purposes of this case, only two of these regulations are important; 7 C.F.R. § 1951.33 outlines the requirements for deferrals on operating loans, while 7 C.F.R. § 1951.40 outlines the requirements for deferrals on farm ownership loans.[5]

### C. Nature of the Program

The foregoing recitation of the history of and the statutory and regulatory framework of the Consolidated Farm and Rural Development Act, while seemingly long and superfluous, is actually necessary to aid this Court in properly construing the mandates, if any, of section 1981a. "Reference to the entire statutory scheme is necessary in analyzing a statute . . . . A court must look to the legislation as a whole in order to discern its statutory purpose." *Plaskolite, Inc. v. Baxt Industries, Inc.*, 486 F.Supp. 213, 216 (N.D.Ga.1980). An examination of the prefatory material reveals that the farmers loan program is a unique mixture of social welfare legislation and legislation carefully designed to supplement the business needs of high credit risk farmers.

Despite this obvious mixture of objectives, it is the position of the government that this Court should interpret § 1981a with the notion that the FmHA is in the *business* of making loans and is not a social welfare organization. The loans are made with the expectation that they will be repaid and must be adequately secured to assure such repayment. Since the government is catering to high-risk borrowers, and since the borrower must be able to generate income in order to pay back the loan, the FmHA must get involved in virtually all aspects of the farmer's operation. Thus, for its own protection, management assistance must be rendered that includes planning, reviewing and evaluating. Yet it must be recognized that, at some point, the government must protect its own interest in

the funds expended and, if the farmer is experiencing severe financial problems, it must attempt to collect the debt or liquidate the collateral. Thus, it is argued, the Court must look at the statutory scheme with a business bias.

The plaintiffs, on the other hand, argue that the farmer loan program is a type of social welfare legislation designed to lift the living standards of lower echelon farmers, and that the legislation should be interpreted accordingly (*i.e.* liberally in favor of the farmers). As support, the plaintiffs cite to *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 99 S.Ct. 1448, 59 L.Ed.2d 711 (1979) wherein it was noted that:

"The overriding purpose of the tax law statute obviously is to ensure prompt revenue collection. The same cannot be said of the SBA and FHA lending programs. *They are a form of social welfare legislation, primarily designed to assist farmers and businesses that cannot obtain funds from private lenders on reasonable terms.*"

*Id.* at 734–35, 99 S.Ct. at 1461–62 (emphasis added). Further, Congress, in commenting on the use of qualified personnel by the Department of Agriculture, refutes the notion that the program is strictly a business venture.

"It is the sense of Congress that in carrying out the provisions of the Consolidated Farm and Rural Development Act, the Secretary of Agriculture should ensure that—

1) only officers and employees of the Department of Agriculture who are adequately prepared to understand the particular needs and problems of farmers in an area are assigned to such area; and

2) a high priority is placed on keeping existing farm operations operating."

Pub.L. No. 95–334, Title I § 126, 92 Stat. 429 (August 4, 1978), *reprinted in*, Congressional Findings, 7 U.S.C. § 1921 (Supp. 1982).

---

**5.** The text of these regulations are set out as     Appendix B and Appendix A, respectively.

It is obvious to this Court from an examination of the above materials that the interpretation of § 1981a should reflect the fact that the farmers loan program is *predominately* a form of social welfare legislation. Accordingly, in interpreting § 1981a, this Court will attempt to implement the social welfare goals of Congress as well as its directive to keep "existing farm operations operating" by placing a liberal, but not a strained, gloss on that section.

## IV. DISCUSSION

As stated, the plaintiffs have brought this suit to challenge the procedures used by the FmHA in implementing the provisions of 7 U.S.C. § 1981a. This section, added in 1978 as an amendment to the Consolidated Farm and Rural Development Act, provides:

> "In addition to any other authority that the Secretary may have to defer principal and interest and forego foreclosure, the Secretary may permit, at the request of the borrower, the deferral of principal and interest on any outstanding loan made, insured, or held by the Secretary under this chapter, or under the provisions of any other law administered by the Farmers Home Administration, and may forego foreclosure of any such loan, for such period as the Secretary deems necessary upon a showing by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrower. The Secretary may permit interest that accrues during the deferral period on any loan deferred under this section to bear no

interest during or after such period: Provided, that if the security instrument securing such loan is foreclosed such interest as is included in the purchase price at such foreclosure shall become part of the principal and draw interest from the date of foreclosure at the rate prescribed by law."

7 U.S.C. § 1981a. The plaintiffs desire the initiation of two procedures not presently being used by the FmHA. First, they desire personal notice of their right to apply for this deferral relief and an opportunity to be heard. Second, they desire the promulgation of regulations concerning the eligibility criteria similar to that used by the FmHA for the Rural Housing loan moratorium statute, 42 U.S.C. § 1475.[6]

The government argues that since § 1981a is permissive in nature, the plaintiffs have no legal basis on which to demand such relief. Also, it argues that even if such relief could be demanded, the present practices of the FmHA provide sufficient compliance with any statutory or constitutional mandates.

Thus, it is left to this Court to decide whether § 1981a creates a mandatory duty on the Secretary to provide FmHA borrowers with personal notice of the substantive provisions of that section. In finding that such personal notice is required, this Court must then determine whether the present practices of the FmHA are sufficient to provide FmHA borrowers with the requisite notice. Finally, this Court must also decide whether the regulatory scheme utilized by the FmHA to implement its loan deferral program is consistent with the Congressionally mandated program for loan deferral contained in § 1981a. The latter issue will be discussed first.

---

**6.** 42 U.S.C. § 1475 provides:

"During any time that such loan is outstanding, the Secretary is authorized under regulations to be prescribed by him to grant a moratorium upon the payment of interest and principal on such loan for so long a period as he deems necessary, upon a showing by the borrower that due to circumstances beyond his control, he is unable to continue making payments of such principal and interest when due without unduly impairing

his standard of living. In cases of extreme hardship under the foregoing circumstances, the Secretary is further authorized to cancel interest due and payable on such loans during the moratorium. Should any foreclosure of such a mortgage securing such a loan upon which a moratorium has been granted occur, no deficiency judgment shall be taken against the mortgagor if he shall have faithfully tried to meet his obligation."

A. *Is the present deferral procedure used by the FmHA consistent with the Congressional mandates of § 1981a?*

It is the position of the government that § 1981a is entirely permissive and therefore leaves the final decision as to the promulgation of regulations with the Secretary of Agriculture. Thus, it is argued, the use of the deferral mechanism already present in the statute for real estate loans [7] and operating loans [8] is a sufficient implementation of the provisions of § 1981a.

The plaintiffs, on the other hand, argue that § 1981a creates an affirmative duty on the Secretary to implement a deferral program comparable to the moratorium procedure used in the rural housing scheme. *See* 7 C.F.R. § 1951.17.[9] They argue that the practices and regulations used by the FmHA, being inconsistent with this mandate, must be restrained. In finding for the plaintiff, this Court will look not only to the plain meaning of the statute but also to the legislative history of § 1981a (in conjunction with the history of federal intervention in agricultural credit as hereinbefore described) as well as at the regulations promulgated pursuant to the comparable provision of the Rural Housing Act.

1. Language of the Statute

"[O]ur duty is to give effect to the intent of Congress, and in doing so our first reference is ... to the literal meaning of the words employed." *United States v. Second National Bank of North Miami*, 502 F.2d 535, 539 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975) (citation omitted).

The government argues that the inclusion in the statute of the phrases "the Secretary may permit ... the deferral of principle and interest," "may forego foreclosure" and the like, unambiguously shows this Court that Congress did not intend to impose that duty on the Secretary as requested by the

plaintiffs, but that instead the decision as to how to implement § 1981a was left to his discretion. As support, the government cites cases enunciating the general rule that the word "may" is permissive "and will be construed to vest discretionary power unless the context of its use clearly indicates a purpose to use it in a mandatory sense." *Koch Refining Co. v. United States Department of Energy*, 504 F.Supp. 593, 596 (D.Minn.1980), *aff'd*, 658 F.2d 799 (Em.Ct. of Appeals 1981). *See also United States v. Reeb*, 433 F.2d 381 (9th Cir. 1970), *cert. denied*, 402 U.S. 912, 91 S.Ct. 1391, 28 L.Ed.2d 654 (1971); *Thompson v. Clifford*, 408 F.2d 154, 158 (D.C.Cir.1968).

As plaintiffs point out, and as the cases establish, the existence of the word "may" in a statute does not necessarily render the procedural implementation of that statute by the appropriate agency discretionary. For example, in *Pealo v. Farmers Home Administration*, 361 F.Supp. 1320 (D.D.C.1973) the Court held that the FmHA did not have the discretionary authority to suspend the interest credit loan programs established by Congress. Although in this case the FmHA has not suspended the implementation of § 1981a, and the case is therefore arguably distinguishable, the approach of the court in *Pealo* is helpful in guiding this Court as to the proper interpretation of the word "may."

"The Court is cognizant that Section 521 may be susceptible of varying interpretations concerning the mandatory nature of the language employed therein. In interpreting the statute, the Court has therefore attempted to ascertain the intent and mandate of Congress consonant with its overall policies. In this regard, it is instructive to note a portion of an opinion by former Assistant Attorney General William H. Rehnquist, now a Justice of the Supreme Court. He stated:

---

7. *See* 7 C.F.R. § 1951.40, attached as Appendix A.

8. *See* 7 C.F.R. § 1951.33, attached as Appendix B.

9. Attached as Appendix C.

'[O]n the question of trying to find a mandatory intent on the part of Congress, it is not a question of looking for the word "shall" as opposed to "may." ' "

*Id.* at 1323–24.

In this case, a reading of the language of § 1981a does not leave this Court with the impression that Congress intended to permit the Secretary to decide whether and what regulations to prescribe in implementing the deferral mechanism. Instead, the Secretary would appear to have discretion only whether to *either* grant a deferral *or* forego foreclosure once the eligibility criteria established by the statute have been met, and for what period of time. Thus, as in *Pealo*, the statute is susceptible to varying interpretations and the Court should look beyond the language of the statute to its legislative history and the policies behind its enactment.

■ However, before diving into the murky waters of the legislative history behind the passage of § 1981a, two points concerning the "plain language" of the act should be made. First, the government contends that the regulations implemented pursuant to the FmHA's already existing authority to defer loan payments (*i.e.*, those used pursuant to § 1981(d)) are also sufficient to implement § 1981a. Yet, § 1981a expressly provides that its authority is *"[i]n addition* to any other authority that the Secretary may have to defer principal and

interest." Thus, it is apparent that Congress intended that § 1981(d) (which is discretionary) and § 1981a should operate in different ways. Second, while Congress indicated in § 1981(d) that the FmHA could use these loan servicing devices "as circumstances may require" with insignificant limitations on that discretion (*see* note 4, *supra*), in § 1981a Congress has established explicit criteria of eligibility for FmHA borrowers seeking payment deferrals. Thus, it can be again concluded that these two sections were intended to operate differently and that while § 1981(d) is discretionary, § 1981a imposes a mandatory duty on the Secretary to implement it through regulations consistent with its underlying purposes.

### 2. Legislative History of § 1981a [10]

■ In analyzing, for interpretive purposes, the words or phrases used in a statute, the court must "give effect to the intent of Congress." *United States v. Second National Bank of North Miami, supra*, 502 F.2d at 539. The legislative history behind the enactment of a statute can provide clues to that intent.

The first substantive legislative discussion of the proposed § 1981a meriting consideration by this Court is found in H.R. Rep.No.986, 95th Cong., 2d Sess. (1978), U.S. Code Cong. & Admin.News 1978, p. 1106. After noting that the purpose of proposed

---

**10.** Both the plaintiffs and the government rely in part on reports and statements made by members of the legislative branch subsequent to the passage of 1981a. In the eyes of the Court, however, these documents provide little guidance in determining legislative intent and therefore warrant no further discussion:

"The retroactive wisdom provided by the subsequent speech of a member of Congress stating that yesterday we meant something that we did not say is an ephemeral guide to history. Though even God cannot alter the past, historians can, *compare* Samuel Butler, Creation Revisited, c. 14, and other mortals are not free from the temptation to endow yesterday with the wisdom found today. What happened after a statute was enacted may be history and it may come from members of Congress, but it is not part of the legislative history of the original enactment."

*Roger v. Frito-Lay, Inc.*, 611 F.2d 1074, 1080 (5th Cir. 1980), *cert. denied*, 449 U.S. 889, 101 S.Ct. 246, 66 L.Ed.2d 115 (1981). *See also United States v. Clark*, 445 U.S. 23, 33 n.9, 100 S.Ct. 895, 902 n.9, 63 L.Ed.2d 171 (1980) ("the views of some Congressmen as to the construction of a statute adopted years before by another Congress have "very little, if any, significance.' "); *United States v. Wise*, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962) ("statutes are construed by the courts with reference to the circumstances existing at the time of the passage. The interpretation placed upon an existing statute by a subsequent group of Congressmen who are promoting legislation and who are unsuccessful has no persuasive significance here.").

§ 1981a was to "clarify" the Secretary's authority with respect to moratoriums on loan payments, *id.* at 4, the report discussed the proposal:

"In another amendment to Title I, Mr. Moore proposed that the Secretary should have explicit authority to provide a moratorium on payment of principal and interest and to forego foreclosure on Farmers Home Administration loans, upon a showing by the borrower that due to circumstances beyond his control he was temporarily unable to meet an installment when due without unduly impairing his standard of living. *Comparable language appears in the Housing Act with respect to housing loans by the Farmers Home Administration and was recommended by Mr. Moore in order to clarify the Secretary's authority.* The amendment was accepted by the committee with a change offered by Mr. Moore to provide that this would be in addition to any authority the Secretary may have under existing law, so that the Secretary's authority under current law would not be reduced or impaired by the proposed amendment."

*Id.* at 27, U.S.Code Cong. & Admin.News 1978, p. 1132 (emphasis added).[11] This language would appear to be ambivalent with respect to a conclusion that § 1981a should be interpreted as imposing a mandatory duty upon the Secretary. However, the reference to "comparable language ... in the Housing Act" indicates a Congressional intent to have the programs implemented in the same manner. It should be noted at this point that the regulations implementing the Housing Act's moratorium provision (42 U.S.C. § 1475)—the same regulations for which the plaintiffs desire to be promulgated for § 1981a—were initially adopted on July 10, 1974 and finalized on October 13, 1977. Thus, in drafting § 1981a Congress knowingly used language "comparable" to that found in § 1475 at a time when the latter section was *being* implemented

pursuant to regulations prescribing the type of eligibility criteria that the plaintiffs desire be promulgated under § 1981a. Congress, therefore, impliedly intended § 1981a to be implemented in a similar manner.[12]

The government responds to the assertion of comparability on two levels. First, it argues that the language of the two acts, while containing some similarities, is not comparable. Second, the government argues that the rural housing and the farmer loan *programs* are not comparable and therefore should not be accorded similar treatment. With respect to the latter argument, the government notes that Rural Housing loans are generally one-time personal loans designed to assist the borrower in obtaining shelter and are paid back from an income source not generated by the borrowed funds. Farmer program loans, on the other hand, consist of a series of loans to assist the borrower in purchasing a farm and operating the enterprise. These funds become the investment capital from which the income to pay back the loan is generated. Thus, if a farmer has a bad year or is hurt by "disaster" conditions, there is a ripple effect. Not only does he lose the income to pay back prior loans, but he must borrow a sufficient amount more to generate enough income to pay off the old loans as well as the new loan. If these "disaster" years string together, at some point the farmer will be unable to generate sufficient income to pay off all of the loans. Thus, it is argued, not only *does* § 1981a give the Secretary greater discretion in implementing the deferral under the Farm Program loans, but it *should* provide him with greater discretion.

█ The distinction between the programs is enlightening and points out important differences. However, it does not change the language of sections 1475 and 1981a, nor the fact that Congress knew said language was comparable. Further, the

---

**11.** Although H.R.Rep. No. 986 discusses a proposed § 1981a different from that eventually passed by Congress, the differences between the House version and the final version are insignificant for the purposes of this case.

**12.** This argument is expanded upon in a subsequent portion of this section.

Secretary does have discretion under § 1981a. Once the eligibility criteria are met, the Secretary can control the length of the deferral period and even deny the use of deferral if it is determined that the borrower lacks "clean hands." *See* 7 C.F.R. § 1951.17(b)(2)(i)(A), Appendix C (regulation *re* Housing Act moratorium provision). Thus, it is apparent that through Section 1981a, Congress is demanding that the FmHA strike a balance between the business nature of the loans and the predominant social welfare nature of the legislation by buying those farmers crippled by circumstances beyond their control a little time to get back on their feet.

With respect to the first argument, despite the government's contentions to the contrary, the language of sections 1475 and 1981a is comparable. The provisions of both sections permit the FmHA borrower to apply for moratorium relief upon request and upon a showing that due to circumstances beyond his control, the borrower is unable to continue making payments without unduly impairing his standard of living. In fact, the obvious similarities between the language used in sections 1981a and 1475 implicates a rule of statutory construction in support of the plaintiffs' position. A short digression from the legislative history of § 1981a to this standard rule is at once helpful and necessary.

■ "*Simpson's* teaching, therefore, is that the difficult task of divining Congressional intent is to be aided by the use of *several* tools of statutory construction." *United States v. Rodriguez*, 612 F.2d 906, 911 (5th Cir. 1980), *aff'd*, 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981) (referring to *Simpson v. United States*, 435 U.S. 6, 98 S.Ct. 909, 55 L.Ed.2d 70 (1977)). A standard rule of statutory construction is that similar language should be given a similar interpretation. "The similarity of language in § 718 and § 204(6) is, of course, a strong indication that the two statutes should be interpreted pari passu." *Northcross v. Board of Education of Memphis City Schools*, 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973). *See also Hotel*

*Equities Corp. v. C. I. R.*, 546 F.2d 725, 728 (7th Cir. 1976) ("'there is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning.' *Atlantic Cleaners & Dryers, Inc. v. United States*, 286 U.S. 427, 433, 52 S.Ct. 607, 608, 76 L.Ed. 1204 ... (1932)."); *United Shoe Workers of America v. Bedell*, 506 F.2d 174, 183 (D.C. Cir.1974). Further, "[i]t is a settled rule of statutory construction that a legislature is presumed to act with knowledge of existing law on the subject." *Finberg v. Sullivan*, 461 F.Supp. 253, 258 (E.D.Pa.1978), *vacated on other grounds*, 634 F.2d 50 (3d Cir. 1980). *See also Cannon v. University of Chicago*, 441 U.S. 677, 696–97, 99 S.Ct. 1946, 1957–58, 60 L.Ed.2d 560 (1979) (It is always appropriate to assume that our elected representatives, like other citizens, know the law, ..."). The fact that § 1981a contains comparable language to that used in § 1475, when coupled with the rules of statutory construction providing that similar language should be given similar treatment and that legislators are deemed to be aware of the existing law on the subject, strongly supports a conclusion by this Court that Congress intended that FmHA would implement § 1981a pursuant to regulations fashioned after those used to implement § 1475. Thus, H.R.Rep.No.986 supports the position of the plaintiffs that the FmHA has not been properly implementing the § 1981a deferral mechanism.

The other substantive discussion of the legislative history of § 1981a is found at 124 Cong.Rec. S56,648 (daily ed. May 2, 1978). The government cites a portion of this discussion as supportive of its position that § 1981a was intended to be entirely permissive. An examination of a larger portion of this legislative history reveals otherwise:

"MR. EAGLETON. Madam President, the Food and Agriculture Act of 1977 provides specific authority for the Secretary of Agriculture to use funds contained in the Agricultural Credit Insurance Fund to pay installments of principal and interest to the holders of notes of

Farmers Home Administration borrowers.

"It was the intent of Congress in providing the Secretary this authority to allow him simply to postpone the payment of principal and interest on FmHA loans for farmers hard pressed due to natural disasters. It was our belief that the Department of Agriculture should carry out a program of loan deferrals for farmers equivalent to what the Small Business Administration provides small businesses. This was very clear in the legislative history. Both in comments I made on the floor of the Senate and in the statement of Representative BURLISON on the floor of the House, reference was made to the loan deferral program of the Small Business Administration which does not charge the borrower additional interest when his loan is deferred.

"FmHA is now in the final stages of developing its system of deferral in order to carry out the provisions of the 1977 farm bill. The FmHA system of deferral requires that deferred interest be added to the outstanding principal, with interest then being charged on the basis of the new adjusted principal. What this means to a farmer with a $50,000 operating loan which is deferred for 2 years is that he will have to pay an additional $1,200 in interest above and beyond what a small businessman in the same circumstances would pay on a deferred SBA loan.

"So far as I am concerned, there is no justification for denying farmers the kind of loan deferral program which is available to small businessmen. My amendment is aimed at correcting this inequity by prohibiting the FmHA from charging interest on interest on deferred loans. This will be effective only in areas which are eligible for emergency loans.

"The loan deferral program originally was intended to give farmers hard pressed by natural disasters a little breathing room when bill-paying time came around. The Farmers Home Administration has instead turned it into a program which burdens farmers with more debt and higher payments. In my

opinion and in that of most of the farmers with whom I have discussed this proposal, the deferral program as proposed by FmHA would cause more financial distress than it would relieve.

"This amendment will correct this situation and will make the loan deferral program a viable tool for assisting hard pressed farmers once again.

"I should note that the original form of my amendment gave the Secretary of Agriculture no discretion in the implementation of the loan deferral program. However, as the result of the personal assurance I have received from the Secretary of Agriculture that the loan deferral program will be carried out without interest being charged on interest, I have modified my amendment so that this deferral program will be within the Secretary's discretionary authority. I hasten to add, however, that the prohibition on the charging of interest on interest remains mandatory for this program.

"It is important to note that the House-passed version of this bill contains a section which provides the Secretary with the authority to grant a moratorium on payments of principal and interest for borrowers who can demonstrate that they are temporarily unable to continue making payments. I have recently received a letter from Representative MOORE of Louisiana, the chief sponsor of this section, which indicates that it was his intent that interest not be charged on interest when a moratorium is granted. I ask unanimous consent that Representative MOORE's letter be printed in the RECORD at this point.

"There being no objection, the letter was ordered to be printed in the RECORD as follows:

House of Representatives

Washington, D. C. May 1, 1978

Hon. Thomas P. Eagleton

Chairman, Subcommittee on Agriculture and Related Agencies, Senate Committee on Appropriations, Washington, D. C.

Dear Senator Eagleton: It has come to my attention that you are interested in an amendment I offered to the Agricultural Credit Act of 1978. H.R. 11501, and which was adopted by the House Agriculture Committee and included in the bill as reported to the House. This legislation passed the House of Representatives on April 24, 1978 by a vote of 347–23. . . .

I believe your primary interest in this *new authority granted the Secretary* involves whether the Farmers Home Administration charges interest upon the interest due under the terms of any loan covered by this legislation. I assure you I had no intention of creating a situation where Farmers Home would take such action, because in fact I feel this action would negate any good a moratorium could provide. It does not seem logical to me to allow a farmer the special provision of delaying the payment of principal and interest on a loan on one hand to help him through difficult financial problems, and turn around on the other hand and ask him to pay interest fees in order to obtain this special consideration. I simply had the desire to allow hard-pressed farmers the chance to place principal and interest payments they could not now meet, at the end of a normal payment period; hopefully, a time when they could meet these obligations. I feel it would be far better to help keep farmers in business as viable producers, especially young farmers, than have them leave agriculture because of the inability to obtain sufficient credit.

I hope this explanation has answered your question about my amendment, and that it will be useful to you. I support H.R. 11501 as being a needed shot in the arm for our overall farm credit situation, and hope you are successful in clarifying this matter before the Senate. . . .

"MR. EAGLETON. Madam President, it is evident to me, therefore, that both Houses of Congress are in support of this concept that interest should not be charged on interest when loans are deferred. Farmers in dire need of relief from adverse financial pressure should not be burdened by such charges. I urge my colleagues to accept my amendment.

"I reserve the remainder of my time.

"MR. ALLEN. Madam President. I yield myself such time as I may require.

"The amendment which the distinguished Senator from Missouri (MR. EAGLETON) had planned to offer provided that the Secretary shall defer the payment of principal and interest on a loan in a disaster area, whether it be a disaster loan or other type of farmers home loan, for a period of 3 years, which seemed to be an amendment that could not be accepted because it required the Secretary to defer payments on a loan for a period of 3 years and obviously that is not a very sound provision because too many people would ask that their loans be deferred for a period of 3 years and since there would be no interest on interest a large number of borrowers would do that.

"The distinguished Senator from Missouri (MR. EAGLETON) has modified his amendment and has given the Secretary the right to so defer loans and in case of the deferral not to charge interest on interest for a period up to 3 years. So this would allow the Secretary in emergency or distressed situations regarding borrowers to defer payments and to charge only the interest on the principal amount and not to charge interest on interest.

"With this change, making it discretionary or optional on the part of the Secretary, the committee will accept the amendment."

*Id.* at 56649–50 (Remarks of Senator Eagleton and Senator Allen) (emphasis added).

A couple of important points can be drawn from this expanded discussion of § 1981a. First, this portion of the legislative history dealt with the Secretary's discretion with respect to *charging interest on interest*; it does not support the government's contention that § 1981a was intended to be permissive. Quite to the contrary, the excerpt shows that the legislators thought they were creating *new* authority designed to help the farmers through trou-

bled times. This is inconsistent with the government's position that regulations promulgated pursuant to *already existing* authority are sufficient to implement § 1981a. Thus, through § 1981a Congress is directing the FmHA to use this new deferral authority and go out and help those farmers who are unable to continue payments (without lowering their standard of living) due to circumstances beyond their control. Second, it is noted that the discretion referred to by Senator Allen goes to the *length* of the deferral period, not to the fact of the deferral.[13] Third, Senator Eagleton's opening remarks indicate that Congress was dissatisfied with FmHA's position on deferral and, as a result of that dissatisfaction, § 1981a was born. This strongly implies that Congress intended § 1981a to be implemented by regulations of its own which would closely parallel its own provisions. Thus, the use of "other" regulations is inconsistent with the mandates of the statute.

In summary, the above discussion of the legislative history and the various tools of statutory construction strongly supports the plaintiffs' position that § 1981a imposes a mandatory duty on the FmHA to implement a deferral program similar to that used pursuant to § 1475 of the Rural Housing Act, and that the present practices and policies of the FmHA are inconsistent with that statutory duty. Before concluding the discussion of this issue, however, one final statutory tool of construction needs to be mentioned.

### 3. Agency "Expertise"

The FmHA, through its practices and through the briefs filed in this case, has taken the position that the proper interpretation of § 1981a is that the section is permissive and that already existing regulations appropriately implement its provisions. The plaintiffs, of course, take the contrary position.

It is a rule of statutory constructions that "Courts must give great weight to the statutory constructions developed by administrative bodies with an expertise in the area of law." *Oilfield Safety and Machine Specialties, Inc. v. Harman Unlimited*, 625 F.2d 1248, 1257 (5th Cir. 1980). Counteracting this rule in this case, however, is the fact that the agency had previously promulgated regulations pursuant to 42 U.S.C. § 1475— an act containing comparable language to that in § 1981a—inconsistent with its present position on § 1981a:

"In *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 ... (1944), the Supreme Court discussed the value of agency pronouncements which did not have the dignity of official regulations of the agency. There the Court states:

We consider the rulings, interpretations, and opinions of the Administrator under this Act, while not controlling upon the courts by reasons of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance. The weight of such judgments in a particular case will depend upon the thoroughness evident in its consideration, the validity of its reasoning, *its consistency with earlier and later pronouncements*, and all those factors which give it power to persuade if lacking power to control."

*Thomas v. County Office Committee of Cameron County*, 327 F.Supp. 1244, 1253 (S.D.Tex.1971) (emphasis added). Since the regulations promulgated pursuant to § 1475 differ materially from the regulations used by the agency pursuant to § 1981a, the agency's "authoritative interpretation" of the section is cast into doubt. Thus, the expertise argument carries little weight in persuading this Court to follow the FmHA's rule of practice in interpreting the nature of the duties imposed by § 1981a.[14]

---

**13.** The three-year deferral period referred to therein was rejected in favor of the House version of § 1981a containing no such limitation. *See* H.R.Rep. No. 1344, 95th Cong., 23 Sess. at 28 (1978).

**14.** Further, "[t]he construction and interpretation of a statute are judicial functions, and when administrative interpretations and judicial construction conflict, the latter must pre-

#### 4. Conclusion

■ It is the opinion of this Court, based on the foregoing discussion of the plain language of § 1981a and the legislative history behind its enactment (as well as the use of standard rules of statutory construction), that Congress intended § 1981a to impose a mandatory duty upon the FmHA to implement a deferral program similar in nature to that already in use under the Rural Housing Act, 42 U.S.C. § 1475. *See* 7 C.F.R. § 1951.17(b)(2), Appendix C. It is also the opinion of this Court that the FmHA did not comply with this Congressional mandate when it chose to implement § 1981a through the use of already existing regulations on deferral. *See* C.F.R. §§ 1951.33, .40, Appendix A and Appendix B. Accordingly, the FmHA is hereby enjoined from failing to implement § 1981a through regulations consistent with those in use pursuant to § 1475. The FmHA is further enjoined from foreclosing on farm program mortgages in Georgia created pursuant to 7 U.S.C. § 1921 *et seq.* until such time as those regulations are in full force and effect.

#### B. *Must the FmHA Provide Borrowers with Personal Notice of the Substantive Provisions of § 1981a?*

The plaintiffs want this Court to issue an Order requiring the FmHA to give borrowers under the farmers loan program personal notice of their right to apply for deferral relief under § 1981a, and an opportunity to be heard upon such an application. The government asserts that no notice is required by the section (since it is permissive in nature); and that even if notice is required, publication in the Code of Federal Regulations of the availability of deferral relief and the proposed notice regulations for § 1981a provide sufficient notice of that section's provisions.

#### 1. Notice is Required

■ Due process considerations aside,[15] it is the opinion of this Court that the plain meaning of the statute coupled with the effect of the *Williams v. Butz*, (No. 176–153, S.D.Ga., October 7, 1977) consent order, mandates a finding that personal notice of the § 1981a deferral mechanism is required. The language of the statute expressly provides that the deferral mechanism is triggered "at the *request* of the borrower." Further, no deferral relief will be forthcoming absent "*a showing* by the borrower that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of such principal and interest when due without unduly impairing the standard of living of the borrower." 7 U.S.C. § 1981a (emphasis added). Logically, the borrower is unable to request the deferral relief and show his eligibility to receive the same unless he has notice of the contents of § 1981a and an opportunity to be heard.

As mentioned, *Williams v. Butz* is also relevant in deciding whether *personal* notice of § 1981a is required. In that case, the plaintiffs brought suit for declaratory and injunctive relief to declare unconstitutional all nonjudicial foreclosures of mortgages financed under the Rural Housing Act,[16] and to enjoin all foreclosures where the mortgagee has not had personal notice of the availability of moratorium relief under 42 U.S.C. § 1475 and an opportunity to be heard. Pursuant to the consent decree entered therein, the parties—the defendants are the same in the case at bar—agreed that under the language of § 1475, FmHA borrowers had the right to *personal notice* of the availability of the moratorium

---

vail." *United States v. One 1960 Ford*, 213 F.Supp. 562, 563 (E.D.Tenn.1962).

**15.** Both parties briefed the due process issue and presented alternative viewpoints to this Court. In finding, however, that the statute itself mandates the giving of personal notice, it is unnecessary to undertake the extensive constitutional analysis.

**16.** The background material laid out in Section III of this Order is a reminder that the Rural Housing Act of 1949 was combined with the Consolidated Farmers Home Administration Act of 1961 to form the present Consolidated Farm and Rural Development Act. The FmHA is charged with the administration of both programs.

relief.[17] This notice was to consist of "a letter at loan closing explaining moratorium and interest credit and strongly recommending that the borrowers make an appointment with the county supervisor to discuss these matters so that they will understand these provisions," *Williams v. Butz, supra* at 4, and the inclusion of the following paragraph in a letter sent to borrowers guilty of missed payments or other breaches of the loan covenants:

> "If you are behind because of something beyond your control, like having less income or unexpected bills, we may be able to help. You may qualify for "Moratorium Relief" which would make it possible for you to miss some payments and still keep your home. Or you may qualify for "Interest Credit" which should make your payments smaller for a while. YOU CANNOT GET "MORATORIUM RELIEF" OR "INTEREST CREDIT" UNLESS YOU APPLY FOR IT. Please contact me immediately and let us see if you qualify or if there is something else we can do to help you keep your home."

*Id.* The FmHA also agreed to inform applicants during pre-loan approval interviews of the availability of moratorium relief through county office personnel. *Id.*

The *Williams v. Butz* consent order is important to a resolution of this case for two reasons. First and foremost, the FmHA agreed that the language of § 1475, found by this Court to be comparable to the provisions of § 1981a, required the agency to give FmHA borrowers *personal notice* of the loan servicing mechanism contained therein. This is contrary to the present position of the FmHA that the language does not mandate giving personal notice. Second, since legislators are "presumed to

act with knowledge of existing law on the subject," *Finberg v. Sullivan*, 461 F.Supp. 253, 258 (E.D.Pa.1978), *vacated on other grounds*, 634 F.2d 50 (3d Cir. 1980), and since Congress knew that in enacting § 1981a it was using "comparable language" to that found in the Rural Housing Act, H.R.Rep.No.986, 95th Cong., 2d Sess. at 27 (1978), it can reasonably be concluded that Congress *intended* § 1981a also to require that the FmHA provide its farmer program borrowers with personal notice of the provisions of § 1981a.

2. What Notice is Required[18]

The FmHA has, independent of this case, proposed two sets of regulations dealing with personal notice to the borrower. One set would "provide a guide letter to be used as a means of notifying delinquent and potential problem case borrowers at the beginning of the production season of conditions that must be met for them to continue receiving FmHA assistance." 46 Fed.Reg. 49908 (1981). The letter would inform borrowers that servicing options such as deferral are available to assist delinquent borrowers. The second set of proposed regulations would "develop a document that explains borrower responsibilities and alternatives available if the borrower is unable to pay in accordance with security instruments and other agreements with FmHA." 46 Fed.Reg. 54751, 54752 (1981). This document "will be given to all applicants/borrowers during the process of loan making." *Id.* at 54751.

The plaintiffs argue that these proposed regulations are deficient for three reasons. First, they contend that the borrower is receiving notice either too early or too late to provide the borrower with timely information as to the availability of deferral as a

---

**17.** The government's attempt to downplay the effect of the *Williams v. Butz* consent Order by contending that it only agreed to the substance of the Order because the changes advocated therein were already being made merits but a passing mention in this footnote.

**18.** Having concluded that personal notice is mandated by § 1981a, this Court need not consider the government's argument that constructive notice of the right to deferral through pub-

lication in the Code of Federal Regulations is sufficient. Further, the finding that § 1981a imposes a statutory duty on the FmHA to provide its borrowers with personal notice of its provisions makes *United States v. Lamoreux*, No. 78–911 (M.D.Pa. March 18, 1980) inapposite. (Therein the Court noted that "[w]ith no statutory or regulatory duty to inform borrowers of the moratorium, the FmHA did not act improperly." *Id.* at 7.)

loan servicing device. Second, the plaintiffs contend that the content of the notice itself is insufficient. Finally, they contend that the placement of the notice on the respective documents is flawed in that such a placement will not properly bring this notice to the borrower's attention.

■ It is the opinion of this Court that whereas the timing of the giving of notice is sufficient to comply with the mandates of § 1981a, the wording and placement of the notice on the respective documents is fatally deficient. With respect to timing, the receipt of proper notice of the opportunity to apply for deferral during the process of loan making and at the beginning of the production season (the latter for delinquent or problem borrowers) is sufficient to inform FmHA borrowers of their deferral rights. In addition, however, while performing their "management assistance" obligation, the FmHA should also notify borrowers of their deferral rights when evaluating and reviewing the farmer's past production year—if it should appear that there is a potential problem.

■ With respect to the content and placement of the notice provision, it is the opinion of this Court that the proposed documents are fatally flawed. An examination of these proposed notices of deferral rights (attached to the proposed regulations) reveals the deficiencies contained therein:

> "Borrowers who are in default according to the terms of their note(s), mortgage(s) or security agreement(s) may have their accounts liquidated; however, borrowers may inquire about the following service options:
>
> \* \* \* \* \* \*
>
> 4) Defer: Postpone the payment of part of a loan installment."

This paragraph has three shortcomings. First, contrary to the language of § 1981a, the borrower is not informed that he can defer both the principal and the interest payments on the loan; thus, deferral can be had for more than "part of a loan installment." Second, the sentence does not in-

form the borrower that he *must apply* for the deferral and that he *must show* that due to circumstances beyond his control he cannot continue making payments without unduly impairing his standard of living. A notice provision fashioned after that used pursuant to the Rural Housing loan program provision on moratoriums, 42 U.S.C. § 1475, would satisfy this deficiency. *See* 7 C.F.R. § 1951.17(1)(ii)(B), Appendix C. Third, the proposed documents bury the notification of loan servicing devices behind rather threatening language concerning past deficiencies and borrower responsibilities. Thus, while it is unnecessary to create a separate letter solely for the purpose of notifying borrowers of the § 1981a deferral mechanism, to assure effective notice, the FmHA should use separate headings within these documents so as to clearly designate the appropriate paragraphs discussing the loan servicing devices or the borrower's rights. In that way the borrower will have notice of the provisions of § 1981a and will not be intimidated into declining to take advantage of that section's benefits.

### 3. Conclusion

It is the conclusion of this Court that § 1981a imposes a duty on the FmHA to provide borrowers with personal notice of its provisions. This notice will be given through a properly drafted paragraph, fashioned after that in use by the FmHA in implementing the moratorium provision of the Rural Housing Act, placed under a separate heading in a document to be given or sent to the borrower during the process of the loan making, and in a document to be given or sent to delinquent or problem borrowers at the beginning of the production season. Accordingly, the FmHA is enjoined from failing to implement the above notice requirement through appropriately drafted regulations. Further, the FmHA is enjoined from foreclosing on any farmer program loans in Georgia created under 7 U.S.C. §§ 1921 *et seq.* until the beneficiary of that loan has received the appropriate notice.

### C. Consolidated Rural Housing and Farm Program Loans

The plaintiffs contend that the defendant improperly services consolidated rural housing and farm program loans under regulations issued pursuant to the farm loan program as opposed to regulations issued pursuant to the rural housing loan program. Thus, borrowers with these consolidated loans lose their rights accorded under the *Williams v. Butz* consent order. The plaintiffs cite the actions taken on the Inez and Remer Curry loans as an example of this improper action.

The Currys, it seems, were recipients of *both* a Farm Program loan and a Rural Housing loan consolidated into one loan. Nevertheless, contrary to the directives of the *Williams v. Butz* consent order, they were not personally informed of nor given an opportunity to apply for deferral, moratorium or interest credit prior to the acceleration of their consolidated loan by the FmHA. The Currys requested and received a hearing at the local level to contest that action. Upon the rendition of an adverse decision following the hearing, the Currys appealed to Washington for further consideration. In Washington, officials of the FmHA's National Office overturned the decision to accelerate the loan and found that with respect to the Rural Housing loan, the proper notice as to moratorium and interest credit must be given. Further, since the only existing security for the Farm Program loan aspect of the consolidated loan was a second security interest in the house and property, the National Office directed the State Office to withdraw foreclosure on that loan also.

The government argues that the Curry case "at best ... constituted an anomaly in Farmers Home Administration practice, occasioned by a slow realization at the local level of the parameters and impact of the *Williams v. Butz* consent." Defendants' Brief in opposition to Plaintiffs' Motion for A Summary Judgment at 52. The government further argues that the Currys aside, and contrary to the plaintiffs' assertions, the procedure to be used in consolidated farm loan and rural housing loan cases is to provide such borrowers with the benefit of the interest credit and moratorium provisions of 42 U.S.C. § 1475. As support, the government cites to proposed regulation § 1951.301, which provides:

"This subpart sets forth policies and procedures of the Farmers Home Administration (FmHA) to ensure that in borrower supervision, servicing and collections of single family housing loan accounts, all authorities are considered and used to assist borrowers to become successful homeowners, thereby reducing the number and amount of borrower delinquencies and borrower failures resulting in liquidation of the account. This subpart pertains to all section 502 and 504 single family rural housing (RH) borrowers *including those who are also indebted for an active Farmer Program type loan. Farmer Program loans will also be serviced in accordance with Subpart B of Part 1924 of this Chapter.*"

46 Fed.Reg. 60182 (1981) (emphasis added).

It is apparent to this Court that the defendants are presently providing consolidated rural housing and farmer program loan recipients the more liberal loan servicing devices provided for by the Rural Housing Program. Accordingly, this Court need not enjoin the alleged violation complained of by the plaintiffs. Further, it appearing that the Currys have now received all rights to which they were entitled, individual relief as to their situation is not mandated.

### V. CONCLUSION

It is the conclusion of this Court that the practices and procedures used by the FmHA in implementing § 1981a are inconsistent with the mandates of that section. Accordingly, the defendants' motion for summary judgment is DENIED, and the plaintiffs' motion for summary judgment is GRANTED, as hereinbefore limited. The defendants are enjoined from failing to implement the following two procedures. First, the defendants are directed to provide the plaintiffs with personal notice of the provisions of § 1981a as outlined in

section IV(B), *supra.* Second, the defendants are directed to promulgate regulations on the eligibility criteria of § 1981a comparable to those presently in use pursuant to the moratorium provision of the Rural Housing Loan Program, 42 U.S.C. § 1475. *See* 7 C.F.R. § 1951.17, Appendix C. Defendants shall submit appropriate suggested forms of notice and regulations within fifteen (15) days of the entry of this Order.

All parties are to bear their own costs.

## APPENDIX A

§§ 1951.34–1951.39 [Reserved]

§ 1951.40 Deferment and reamortization of FO, SW, RL, EE or EM loans made for real estate purposes.

All borrowers are expected to repay their loans according to planned repayment schedules. However, circumstances may occur which will not permit borrowers to pay as scheduled or to refinance loans. This section explains how the County Supervisor can reamortize and defer installments on existing loans. County Supervisors are authorized to approve deferments and reamortization of loans under this section including assumption agreements.

(a) *Definitions:* (1) Reamortization means to rearrange the installments of a loan which may include changing the interest rate and terms of the loan.

(2) Defer means to postpone the payment of part of a loan installment.

(b) *Requirements.* These servicing actions will not be taken if a borrower's account(s) is being serviced or is planned to be serviced in the near future by the OGC or the U.S. Attorney. Also, these servicing actions will not be used for the purpose of avoiding FmHA graduation requirements.

(1) Loans should be reamortized, subject to the following conditions: (i) FO, SW, RL, EE, and EM loans should be reamortized when it will be in the best interest of the borrower and the Government.

(ii) A loan will not be reamortized only to remove a delinquency.

(iii) A delinquent account will not ordinarily be reamortized if it appears the borrower can pay the account current within two years.

(iv) At the time of reamortization an FO loan may be changed to a limited resource interest rate if the borrower meets the requirements for a limited resource interest rate.

(2) Installments on existing FO, SW, RL, EM and EE loans should be deferred subject to the following conditions: (i) The deferment is necessary to enable the borrower to remain on the farm.

(ii) The borrower shows that due to circumstances beyond the borrower's control, the borrower is temporarily unable to continue making payments of principal and interest due on the loan without unduly impairing the borrower's standard of living.

(iii) The borrower is cooperating in servicing the account and maintaining the security.

(iv) Payments are not being deferred just to remove a delinquency or delay liquidation.

(v) A Farm and Home Plan and Business Analysis—Nonagricultural Enterprise, when appropriate, shows that the reamortized installments or the full installments at the end of the deferred period can be paid.

(c) *Terms.* (1) Reamortized installments usually will be scheduled for repayment within the remaining period of the note or assumption agreement being reamortized. If any repayment is extended, the new repayment period may not exceed 40 years from the date of the original note or assumption agreement or the useful life of the security, whichever is less.

(i) The FmHA's lien priority may be affected if the final due date of the original loan is changed. A State supplement will be issued to provide instructions on the effect a change in due date has on security instruments and the action necessary to retain the Government's lien priority. The State supplement will also include instructions in releasing the original security instrument when a new one is obtained.

(ii) The amount of interest accrued at the time of reamortization will be added to the principal unless a deferment is involved. If there are no deferred installments, the first installments under the reamortization will be at least equal to the interest which will accrue on the new principal between the date of Form FmHA 1940–17 and the next January 1.

(2) Generally, only one installment will be deferred at a time. However, more than one installment, but not more than three, should be deferred if it is determined that such action is necessary to enable the borrower to remain on the farm.

(i) The deferred period cannot be later than the final due date on the promissory note or assumption agreement unless the final due date is changed by reamortization as provided in paragraph (c)(1) of this section.

(ii) Whole installments will not be deferred. Some payment will be scheduled on each installment due date.

(iii) When a deferment is necessary the loan will be reamortized and the installments scheduled in accordance with the borrower's repayment ability.

(iv) Borrowers will be encouraged to make additional payments during the deferral period if they are able to do so.

(d) *Interest.* (1) The interest rate for other than limited resource loans will be the current interest rate in effect at the time the reamortization is granted except for EM actual loss loans in which case the interest rate will not be changed.

(2) If a limited resource loan is reamortized within the first three years the interest rate will be the same rate at which the loan was initially made. After the first three years a limited resource loan may be reamortized at the interest rate in effect at that time for that loan or at a higher rate in accordance with the borrower's repayment ability. If the interest rate is to be increased it may be done in increments of whole numbers to the current rate for non-limited resource borrowers.

(3) The amount of all accrued interest through the date the reamortization is granted will be added to the principal. When it is necessary to defer part of the interest, the amount deferred will be limited to that amount shown in the Farm and Home Plan to be necessary to enable the applicant to regain repayment ability. Interest accrued during the deferral period will not be added to the principal. Installments after the deferral period will be scheduled for payment in accordance with the FMI for Form FmHA 1940–17.

(e) *Processing.* A separate Form FmHA 1940–17 will be used for each note or assumption agreement being reamortized or deferred.

(1) Form FmHA 1940–17 may be processed provided the County Office has possession of the original note or assumption agreement being reamortized or deferred. If the County Office does not have possession of the original note or assumption agreement, the County Supervisor will ask the Finance Office to return the original form so it is in the County Office *before* Form FmHA 1940–17 is processed.

(2) Form FmHA 1940–17 will be completed, signed, and distributed as provided in the FMI.

(3) Form FmHA 1951–4 will be completed and sent to the Finance Office to inform it of the new terms.

(4) The original and County Office copy of notes or assumption agreements that are reamortized or on which payments are deferred will be marked "REAMORTIZED, (*date*)" OR "DEFERRED, (*date*)", as appropriate. The original of Form FmHA 1940–17 will be attached to the original of the note or assumption agreement being reamortized or deferred and filed in the promissory note folder. A copy of each will be filed in the borrower's case file.

(5) There is no limit on the number of times a Form FmHA 1940–17 can be processed providing the requirements for reamortization are met each time this form is processed. No more than 3 installments may be deferred at one time.

[44 FR 46251, Aug. 7, 1979, as amended at 44 FR 75132, Dec. 19, 1979]

## APPENDIX B

§ 1951.33 Deferral, consolidation and rescheduling of OL, and EM and EE loans made for Subtitle B purposes.

All borrowers are expected to repay their loans according to planned repayment schedules. However, circumstances may occur which will not permit borrowers to pay as scheduled or to refinance the loans. This section explains how to consolidate, reschedule, and defer installments on *existing* loans providing the borrower agrees to such actions.

(a) *Definitions:* (1) Subtitle B purposes are the loan purposes stated in § 1941.16 of Subpart A of Part 1941 of this chapter.

(2) Reschedule means to rewrite the rates and/or terms of OL, EM or EE loans made for Subtitle B purposes.

(3) Consolidate means to combine and reschedule the rates and terms of two or more OL, EM or EE loans made for Subtitle B purposes for other than actual losses.

(4) Defer means to postpone the payment of part of a loan installment.

(b) *General requirements.* County Supervisors are authorized to approve, consolidate, reschedule and defer loans. When the County Supervisor determines that consolidation, rescheduling and deferral will assist in the orderly collection of the loan, the County Supervisor should take such action, provided:

(1) Such action is not used in lieu of or to delay liquidation;

(2) Such action is not taken to only remove a delinquency;

(3) Such action is not taken to circumvent FmHA's graduation requirements;

(4) The borrower's account is not being serviced by OGC or the U.S. Attorney, and there are no plans to have the account serviced by either of these offices in the near future;

(5) The County Supervisor determines that the borrower is making satisfactory progress or will make satisfactory progress with revised repayment terms; and

(6) The borrower is cooperating in servicing the account and is maintaining the security.

(c) *Consolidation and rescheduling OL loans.* (1) An OL loan secured by real estate will not be consolidated or rescheduled, unless the County Supervisor reviews the Government's real estate lien priority and value of security and determines such an action will be in the best interests of the Government and the borrower.

(2) OL loans will be consolidated only with other OL loans.

(3) The amount of outstanding accrued interest at the time of consolidation or rescheduling will be added to principal.

(4) Consolidated and rescheduled loans will be repaid according to the borrower's repayment ability, but never in excess of seven years from the date of consolidation or rescheduling.

(5) The interest rate for consolidated or rescheduled loans will be the current interest rate for OL loans made to regular or limited resource loan borrowers, as appropriate. Limited resource loan interest rates will be stated in increments of whole numbers and may be increased to the current OL rate or decreased to not less than the current limited resource interest rate set out in Exhibit B of FmHA Instruction 440.1 (available from any FmHA office), in accordance with a borrower's repayment ability.

(d) *Consolidated and rescheduling EE and EM loans.* EE and EM loans made for real estate purposes will *not* be consolidated and rescheduled under any circumstances. EE and EM loans made for operating purposes may be consolidated and rescheduled subject to all of the following conditions:

(1) EE and EM loans may be consolidated and rescheduled when it is in the best interests of the borrower and the government.

(2) EM actual loss loans will *not* be consolidated.

(3) EM annual operating loans can be consolidated only with other EM annual operating loans.

(4) EM major adjustment loans for operating purposes can be consolidated only with other EM major adjustment loans for operating purposes.

(5) EE and EM loans which were made without a consolidation and rescheduling action and which have repayment terms greater than seven (7) will *not* be consolidated.

(6) EE loans made for operating purposes can be consolidated only with other EE loans made for operating purposes.

(7) Before a consolidation occurs and a new note is taken, the County Supervisor must review the government's lien priority and see if any new liens have been filed on the security for the loan. If there are any liens which were not in existence at the time the first note was signed, the County Supervisor should ask OGC for an opinion as to what lien position the government will have if the consolidation occurs and a new note is taken. Then the County Supervisor must determine that the government's interests will be protected adequately if the consolidation occurs.

(8) Repayment terms for consolidated and rescheduled EE or EM loans will be:

(i) Seven (7) years or less from the date of the consolidation or rescheduling, but consistent with the borrower's repayment ability.

(ii) Equal to or greater than the longest repayment terms established on the existing EE or EM loans being consolidated. For example, if a borrower's existing loan is due in five (5) years, the consolidated loan must be due in at least (5) years.

(9) Repayment terms for EE and EM loans which are rescheduled without an accompanying consolidation action will not exceed twenty (20) years from the date of the original note.

(10) The interest rate for consolidated or rescheduled loans:

(i) For EE loans, will be the current loan rate in effect as specified in Subpart A of Part 1810 of this chapter (FmHA Instruction 440.1, Exhibit B available in any FmHA office) at the time of consolidation or rescheduling.

(ii) For EM actual loss loans, will *not* be changed from the rate in the original note.

(iii) For EM annual operating loans or EM major adjustment loans for Subtitle B (operating) purposes, will be the current rate specified in Subpart A of Part 1810 of this chapter (FmHA Instruction 440.1 Exhibit B available in any FmHA office) at the time of consolidation and rescheduling.

(e) *Deferral of OL, EM, and EE loans made for Subtitle B purposes.* Installments on loans, including loans that are consolidated or rescheduled, may be deferred. The use of deferral authority will generally involve beginning farmers, applicants with limited income and resources, and applicants who have had production and economic losses because of natural or economic conditions.

(1) Deferred payments may be authorized if the following conditions exist: (i), A Form FmHA 431–2 "Farm and Home Plan" and, if appropriate, Form FmHA 431–4, "Business Analysis-Nonagricultural Enterprise," shows loan installments cannot be repaid according to schedule.

(ii) A typical Farm and Home Plan and, if appropriate, a Business Analysis-Nonagricultural Enterprise for a full crop year (calendar year for EM) following the deferral period indicates that full installments can be paid if normal conditions exist.

(iii) If appropriate, a Form FmHA 431–1, "Long-time Farm and a Home Plan," is prepared.

(iv) If appropriate, development and improvements have been provided for on Form FmHA 424–1, "Development Plan."

(2) Scheduling and repaying deferred installments. (i) Up to three installments may be deferred, but in no case will the deferral extend beyond the final due date of the note. Partial payments of accrued interest will be scheduled annually during

the deferral period on Form FmHA 1940–17, "Promissory Note." Full payments will be scheduled at the earliest date the Farm and Home Plan indicates they can be repaid.

(ii) borrowers will be advised that they are expected to make payments as soon as they have repayment ability, even though the deferral period has not expired.

(iii) Deferred interest will not be capitalized.

(iv) Installments of principal and interest to be paid after the deferral period will be calculated in accordance with the FMI for Form FmHA 1940–17.

(f) *Processing.* (1) Form FmHA 1940–17 will be prepared for notes or assumption agreements being consolidated or rescheduled in accordance with the provisions of the FMI. If the County Office does not have possession of the original note or assumption agreement, the County Supervisor will ask the Finance Office to return the original form so it is in the County Office *before* Form FmHA 1940–17 is processed. Form FmHA 1951–4, "Change in Rates and Terms," will be completed and sent to the Finance Office in accordance with the provisions of the FMI.

(2) The original and County Office copy of all notes or assumption agreements that are consolidated or rescheduled, will be stamped "Consolidated", or "Rescheduled", as appropriate, by the County Office. The original instruments being consolidated or rescheduled will be filed with the borrower's new consolidated or rescheduled note and a copy filed in the borrower's case file. When the consolidated or rescheduled note has been paid in full or otherwise satisfied, it and all other instruments will be handled in accordance with the provisions of § 1951.15 of this subpart.

[44 FR 46251, Aug. 7, 1979, as amended at 44 FR 75132, Dec. 19, 1979; 45 FR 58815, Sept. 5, 1980]

APPENDIX C

§ 1951.17  Moratorium on principal and interest payments on Sections 502 and 504 loans.

A moratorium on principal and interest payments shall be granted on Sections 502 and 504 RH loans, as authorized under section 505 of the Housing Act of 1949, upon determination that, due to circumstances beyond the borrower's control, the borrower is unable to continue making scheduled payments without unduly impairing his or her standard of living. Cancellation of interest accrued during the moratorium period is also authorized in cases of extreme hardship.

(a) *Definitions.* As used in this section: (1) "Scheduled payments" means the amount of the monthly or annual installment on an RH loan promissory note as this amount may be modified by any outstanding Interest Credit Agreement, Supplementary Payment Agreement, Additional Partial Payment Agreement, or other written agreements between FmHA and the borrower.

(2) "Unduly impaired standard of living" means a condition whereby the borrower, due to circumstances beyond the borrower's control, is unable to pay normal living expenses and scheduled payments as provided by the loan documents. The borrower must present evidence that the inability to repay the loan will probably last for a period of 6 months or more and that income will be available to resume payments after the moratorium period. The circumstances include but are not limited to the following:

(i) A substantial reduction of income which will cause the total payments on the RH loan and the taxes and insurance on the dwelling to exceed the borrower's ability to pay after all interest credits authorized have been granted. (A moratorium based on loss or reduction of income will not be granted if the sum of the principal, interest, real estate taxes and insurance is less than 30 percent of the borrower's adjusted income based on the next 12 months' projected earnings. The fact that such payments would exceed 30 percent of the borrower's projected annual income does not by itself mean that the borrower is eligible for moratorium.) Such reduction may result from:

(A) Unemployment or underemployment caused by circumstances beyond the borrower's control, or

(B) Loss or reduction in benefits which constituted a substantial part of the annual income as defined in § 1822.3(n) of Subpart A of Part 1822 of this chapter (paragraph N of FmHA Instruction 444.1), or

(C) Illness, injury, or death of the borrower or other adult who contributed to the annual income, or

(D) A situation in which a spouse is living apart from the borrower's family and away from the RH financed dwelling and legal papers have been filed with the appropriate court to commence divorce or legal separation proceedings provided: The remaining spouse is occupying the dwelling, owns a legal interest in the property, is liable for the debt, and the loan account is put in the remaining spouse's name only, or

(E) A situation in which a spouse has lived apart from the borrower's family and away from the RH financed dwelling for 6 months or longer because of broken marriage or separation and not because of work assignment or military order and legal papers have not been filed to commence divorce proceedings, provided the conditions of § 1951.17(a)(2)(i) of this subpart are met by the borrower who is living in the dwelling. (For purposes of the retroactive provisions of paragraph (b)(4) of this section, the moratorium may be effective 90 days prior to the end of the 6-month period or the filing of a request for moratorium, whichever is later.)

(ii) The need to pay certain essential family expenses which have or may result in a lien being place on the borrower's dwelling, and which if not paid are likely to result in loss of the dwelling. Such expenses may result from:

(A) Accident, illness, or injury to the borrower or dependent member of the borrower's family, or

(B) Death of a member of the borrower's family, or

(C) Cost of repairs for uninsured damage to the security if the loss occurred because adequate insurance coverage was not available.

(3) "Extreme hardship" means that condition described in paragraph (a)(2) of this section, which has continued until interest accruing on the loan causes the amount of monthly or annual payments on the balance of the debt to exceed the borrower's repayment ability if the debt is reamortized over the remaining term of the loan plus any extension authorized in paragraph (e)(1)(iii) of this section, unless all or part of the interest which accrued during the moratorium period is canceled.

(b) *Policy guidelines in granting moratorium.* (1) Applicants and borrowers will be advised of the moratorium provisions as follows:

(i) In the interview required by § 1822.-11(c) of Subpart A of Part 1822 of this chapter. (Paragraph XI C of FmHA Instruction 444.1), the interviewer will inform the applicant(s) of moratorium provisions under this subpart.

(ii) The County Supervisor will advise borrowers in writing of the possible availability of a moratorium when any of the following conditions exist:

(A) The County Supervisor becomes aware of a change in the borrower's circumstances which would be likely to justify the granting of a moratorium, or

(B) The borrower fails to make payments as agreed and the County Supervisor sends a collection letter or writes to schedule an appointment to develop a new repayment agreement. The letter will include the following statement: "You may be interested in knowing that you may apply for a moratorium on payments if, due to circumstances beyond your control, you are unable to continue making scheduled payments on your rural housing loan account without unduly impairing your standard of living. Some of these circumstances are: Loss of your job or sudden reduction of income from other sources; a loss of income or a substantial increase in expenses due to injury, illness, or death in the family; or under certain conditions, in cases of separation,

when your spouse is living apart from the family and the RH financed dwelling."

(iii) A notice of acceleration and demand for payment (Exhibit C of Subpart A of Part 1955 of this chapter) is sent to a borrower whose loan has been approved for forced liquidation because of monetary default. Paragraph 10 of the notice will be revised as follows: "HOWEVER, YOU HAVE THE OPPORTUNITY TO HAVE A MEETING BEFORE THIS FORECLOSURE TAKES PLACE. If you wish to make use of this opportunity to meet because you believe the United States is in error in accelerating your account(s) and proceeding with the foreclosure, or because you have not been advised of your rights to request a moratorium on payments on your rural housing loan account, you should IMMEDIATELY contact the District Director of the Farmers Home Administration in writing at the following address: _____."

(2) Moratorium on principal and interest payments on an RH loan account may be granted provided:

(i) The borrower: (A) Has, before experiencing the hardship, paid real estate taxes, property insurance premiums, and RH loan payments when due, or in accordance with an approved repayment schedule which was developed based on the borrower's ability to pay, and has complied with the other conditions of the loan documents, and

(B) Requests a moratorium on payments in accordance with paragraph (c) of this section and appropriate documents the conditions causing the unduly impaired standard of living.

(ii) The County Supervisor: (A) Has verified the accuracy of the information received with the request for a moratorium on payments from the borrower, and

(B) Has determined, after using all other alternatives such as granting all authorized interest credits, that a moratorium on payments is still necessary and the borrower is eligible for such moratorium on payments.

(3) The County Supervisor is authorized to approve or disapprove a request for a moratorium. The borrower will be notified

of the action taken within 15 days after request has been received in the County Office. The decision relative to a moratorium is recorded on FmHA 451–23, "Moratorium on Payment: (Section 502–504 RH loans)." The reasons and justification for approval or disapproval will be noted or attached as additional information. An original and two copies will be prepared and distributed as indicated on the FMI. If the moratorium is denied, the borrower will not notified by letter which will include the following:

(i) A statement of the action taken, a recitation of the facts upon which the decision is based, and the specific reason(s) for the decision denying the moratorium.

(ii) An invitation to call at the County Office to discuss the decision with the County Supervisor. If the borrower wishes to bring additional information or a representative to the meeting, the borrower may do so.

(iii) A statement that the borrower may appeal the decision. The statement will advise the borrower of appeal rights, in accordance with Subpart B of Part 1900 of this chapter.

(4) A moratorium may be granted for 6 months. The moratorium may be retroactive for up to, but not more than, 90 days prior to the date the request for a moratorium was received in the County Office if the circumstances for which the moratorium is to be granted existed during that time.

(5) Immediately before the end of each 6-month period, or sooner if the County Supervisor becomes aware of the facts that substantially change the borrower's repayment ability, the justification for a moratorium will be reviewed by the County Supervisor and the moratorium terminated or extended for another 6-month period if the facts so warrant. The extension will be processed in accordance with paragraph (b)(3) of this section prior to the expiration date of the current moratorium. No moratorium plus extensions may exceed 3 years, and 5 years from the end of the moratorium plus extensions must elapse before another

moratorium may be granted unless prior approval is received from the State Director. If the situation creating a hardship continues after 3 consecutive years of moratorium and the borrower is still unable to make scheduled payments even if the account were reamortized, and all authorized interest credits were granted, and interest accrued during the moratorium were cancelled, the account must be liquidated in accordance with applicable FmHA regulations. If, at the end of the moratorium period and any extensions thereof, it is determined that the account will be continued (as modified by any interest credit or interest cancellation assistance), it will then be handled in accordance with paragraph (e) of this section.

(6) Interest will accrue during the moratorium at the rate shown on the promissory note as modified by an Interest Credit Agreement. Interest credits will be granted and renewed throughout the period a moratorium is in effect for all loans eligible for interest credits under Exhibit E Subpart A of Part 1822 of this chapter (FmHA Instruction 444.1).

(7) Cancellation of any part or all of the interest accrued during the moratorium plus any extension thereof, will be granted only in cases of extreme hardship as defined in paragraph (a)(3) of this section. Cancellation will be done in accordance with paragraph (e) of this section.

(c) *Request for moratorium.* The County Supervisor will provide the borrower who wishes to apply for a moratorium with two copies of Form FmHA 451–22, "Request for Moratorium on Payments (Sections 502–504 RH Loans)." The borrower, who may be assisted by County Office personnel, will complete the applicable spaces on the form, and sign and return the original to the County Supervisor. The County Supervisor will retain the original in the borrower's case folder.

(d) *Borrower's appeal of adverse action.* The borrower may appeal an adverse action on the request for moratorium, extension, or cancellation of interest accrued during the moratorium. The appeal will be handled in accordance with Subpart B of Part 1900 of this chapter.

(e) *Action at the expiration of the final moratorium period.* (1) At the end of the moratorium period, the County Supervisor will verify the borrower's annual income and obtain a current financial statement to determine the borrower's ability to repay the unpaid balance of the RH indebtedness. Interest cancellation, reamortization of the account, and repayment schedules will be determined in accordance with the following provisions:

(i) Borrowers who can repay, within 2 years, any principal and interest which was deferred during the moratorium period, in addition to the regular scheduled installments, will execute Form FmHA 451–37, "Additional Partial Payment Agreement," to establish a new repayment schedule.

(ii) For borrowers who cannot meet the repayment requirements of paragraph (e)(1)(i) of this section, the unpaid principal and interest balance of the loan will be reamortized within the remaining term of the loan.

(iii) For borrowers who cannot meet the repayment requirements of paragraph (e)(1)(ii) of this section, the loan account will be reamortized and the remaining term of the loan may be increased to the maximum legal term for the loan (33 years from the date of the note for a section 502 RH loan, or 20 years from the date of the note for a section 504 RH loan) plus a period not to exceed the time the moratorium was in effect. State supplements will be issued for extending the term of the loan or advice will be obtained from OGC on a case by case basis. The borrower must pay for title clearance and legal services needed to assure that the Government's lien priority is retained.

(iv) If the determination is made that the borrower cannot make scheduled payments on the balance owed under the terms of paragraph (e)(1)(iii) of this section without cancellation of part or all of the interest which accrued during the moratorium, the County Supervisor will determine how

much interest must be cancelled to enable the borrower to repay the loan during the time authorized in paragraph (e)(1)(iii) of this section. The County Supervisor will complete Section II of Form FmHA 451–23 indicating the amount of interest cancelled. Such amount will be deducted from the balance owned in determining a new repayment schedule.

(v) The borrower will be advised by letter of the action taken, the reasons for the action, the new repayment schedule, and that, if the borrower does not agree with the action taken, the borrower may appeal the action as provided in paragraph (d) of this section.

(2) The County Supervisor, after a determination concerning the cancellation of interest has been made, will complete Form FmHA 452–2, "Reamortization and/or Deferral Agreement," if the account is to be reamortized or Form FmHA 451–37 if reamortization is not planned. If Form FmHA 451–37 is submitted, the County Supervisor will appropriately change County Office records to reflect the amount of the new installments.