**Darrell BUKASKE, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF AGRICULTURE, Farm Service Agency and Ann Veneman, Secretary of Agriculture, in her official capacity, Defendants.**

**No. CIV. 00–1011.**

United States District Court,
D. South Dakota,
Northern Division.

March 27, 2002.

Randall Briggs Turner, Attorney at Law, Aberdeen, SD, for Plaintiff.

Stephanie Carlson Bengford, U.S. Attorney's Office, Sioux Falls, SD, for Defendants.

ORDER

KORNMANN, District Judge.

## INTRODUCTION

[¶ 1] The Farmer's Home Administration ("FmHA"), the predecessor to the Farm

Service Agency ("FSA"), was "a lender of last resort for farmers who cannot obtain credit from private lenders." *Moseanko v. Yeutter,* 944 F.2d 418, 421 (8th Cir.1991). Unlike private lenders, FmHA exercised wide authority to compromise or adjust loans. *Coleman v. Block,* 562 F.Supp. 1353, 1364 (D.N.D.1983). 7 U.S.C. § 1981a provided authority for FmHA to compromise, adjust, or reduce claims, to adjust and modify the terms of mortgages, to defer principal and interest and to forego foreclosure for such period as the Secretary deems necessary. *Curry v. Block,* 541 F.Supp. 506, 512 (S.D.Ga.1982).

[¶ 2] In 1977, farmers began experiencing financial difficulties, due in large part to adverse weather and economic conditions. *Curry v. Block,* 541 F.Supp. at 509. Following widespread notices of intent to foreclose, class action litigation commenced in the early 1980's in Georgia, challenging FmHA's failure to provide borrowers with personal notice of and an opportunity to apply for deferral relief under 7 U.S.C. § 1981a and failure to promulgate regulations implementing that statute. The district court in Georgia directed the United States Department of Agriculture ("USDA") and FmHA to provide the plaintiffs with personal notice of the provisions of § 1981a and to promulgate regulations on the eligibility criteria of § 1981. *Curry v. Block,* 541 F.Supp. at 525–26.

[¶ 3] Class action litigation challenging FmHA's practices also was commenced in North Dakota. In 1983, the USDA and FmHA were enjoined from three activities, namely terminating a farmer's living and operating allowance, accelerating indebtedness and instituting foreclosure proceedings with the injunction to continue until borrowers were given prior notice of the reasons for the proposed action, an explanation of the eligibility for loan deferral options under § 1981a, and of their right to a hearing. *Coleman v. Block,* 562 F.Supp. 1353, 1367 (D.N.D.1983). The district court subsequently certified a national class of FmHA borrowers and, on November 14, 1983, the injunction was extended to apply to the national class and became a permanent injunction. *Coleman v. Block,* 580 F.Supp. 192 (D.N.D.1983).

[¶ 4] On November 1, 1985, in response to the various court rulings, regulations were enacted pursuant to § 1981a. 50 Fed.Reg. 45,740. Those regulations provided that three forms were to be sent to delinquent borrowers, including forms describing debt servicing options available to borrowers. *See Coleman v. Block,* 632 F.Supp. 1005, 1007–08 (D.N.D.1986). Those forms were challenged on several grounds. The District of North Dakota rejected many of plaintiffs' challenges to the new regulations but accepted a due process challenge, finding that they gave inadequate notice to delinquent borrowers of their loan servicing options, particularly in conjunction with the fact that borrowers who sought additional information from county FmHA offices received inadequate or misleading information. *Coleman v. Block,* 663 F.Supp. 1315, 1332 (D.N.D.1987). On May 7, 1987, USDA and FmHA were ordered to amend the forms. *Coleman v. Block,* 663 F.Supp. at 1333.

[¶ 5] Both sides appealed the 1987 *Coleman* order. During the pendency of the appeal, Congress enacted the Agricultural Credit Act of 1987, Pub.L. No. 100–233, 101 Stat. 1568 (1988). Title VI of the Act made extensive changes in the statutory provisions which had formed the background for the *Coleman* litigation, the changes being designed to carry out the intent of the *Coleman* decisions. *Coleman v. Lyng,* 864 F.2d 604, 608–9 (8th Cir. 1988). Congress essentially required USDA and FmHA to do everything the district court ordered, rendering the appeals moot. *Id.* at 609–12.

[¶ 6] Various provisions of the Agriculture Credit Act of 1987 once again bring USDA and FmHA's successor before the courts. One of the debt restructuring options set forth in the Act is the "writing down of principal and accumulated interest charges" on FmHA loans. 7 U.S.C. § 1991(b)(3)(C). For qualified delinquent debtors, the debt could be written down to a level at which a feasible plan of repayment could be developed; the write-down was to provide a return to the federal government equal to the net recovery from an involuntary liquidation at the time of the write-down. 7 CFR § 1951.902 (1989). Net recovery value is the estimated amount the government would recover from the sale of a debtor's mortgaged property, minus expenses, after an involuntary liquidation. 7 U.S.C. § 2001(c)(2) (1988). A borrower who qualified for a write-down of an FmHA loan was required to enter into a shared appreciation agreement ("SAA"). 7 C.F.R. § 1951.909(e)(4)(vi) [formerly 7 C.F.R. § 1951.909(e)(5)(iii)(D) ].

[¶ 7] Darrell and Velda Bukaske qualified for a write-down and, on July 19, 1989, they entered into a SAA with FmHA. The term of the SAA was ten years, expiring on July 19, 1999. In connection with a divorce between the Bukaske's, Velda conveyed her interest in the property, subject to all existing contracts, to Darrell ("Bukaske"). On May 17, 1994, FSA released Velda from personal liability with regard to the loan. Bukaske is thus the sole debtor potentially liable under the terms of the SAA.

[¶ 8] The essential terms of the SAA are as follows:

As a condition to, and in consideration of, FmHA writing down the above amounts and restructuring the loan, Borrower agrees to pay FmHA an amount according to one of the following payment schedules:

1. Seventy-five (75) percent of any positive appreciation in the market value of the property securing the loan as described in the above security instrument(s) between the date of this Agreement and either the expiration date of this Agreement or the date the Borrower pays the loan in full, ceases farming or transfers title of the security, if such event occurs four (4) years or less from the date of this Agreement.[1]

2. Fifty (50) percent of any positive appreciation in the market value of the property securing the loan above as described in the security instruments between the date of this Agreement and either the expiration date of this Agreement or the date Borrower pays the loan in full, ceases farming or transfers title of the security, if such event occurs after four (4) years but before the expiration date of this Agreement.

The amount of recapture by FmHA will be based on the difference between the value of the security at the time of disposal or cessation by Borrower of farming and the value of the security at the time this Agreement is entered into. If the borrower violates the term (sic) of this agreement FmHA will liquidate after the borrower has been notified of the right to appeal.[2]

[¶ 9] The value of the real estate securing the loan at the time the SAA was entered into was $212,700.00. The total amount of the write-down was $177,404.57. Shortly before the expiration of the SAA, FSA caused the land to be appraised and the

---

**1.** Part of this provision makes no sense. Since the agreement had a ten year term, the agreement obviously could not expire during the first four years.

**2.** For some unknown reason this provision obviously makes no reference to the value of the security on the expiration of the agreement.

appraisal value was $395,000.00. On May 19, 1999, FSA notified Bukaske that the SAA had "matured" and that FSA had calculated the shared appreciation due at $91,150, fifty percent of the total increase in value, i.e. $182,300.00.

[¶ 10] Bukaske claims not to owe any shared appreciation. He claims he has complied with the terms of the SAA, i.e. he did not cease farming, transfer title to the real estate, or pay his loan in full. Bukaske sought reconsideration based upon claimed ambiguity in the SAA and his alternative claim that the appraisal value used to calculate shared appreciation due was too high so that the amount of the recapture should be lower. The local farm loan officer denied reconsideration based upon her claimed lack of "authority to make a decision on these matters." Bukaske appealed to the National Appeals Division of USDA based upon the claim that no shared appreciation is due under the terms of the SAA. The National Appeals Division hearing officer held that the "question of ambiguity of the SAA may be a legal matter which is beyond the administrative authority of this hearing determination" and that the "Agency's decision to determine the Appellant owed $91,150 under a SAA was not erroneous." Bukaske requested that the director of the National Appeals Division review the hearing officer's determination, contending that the SAA had expired and thus no shared appreciation is due. He also objected to the hearing officer's conclusion that, "under shared appreciation, $91,150 is owed to the Agency." The director upheld the hearing officer's decision.

[¶ 11] Moving next to federal court, Bukaske filed an amended complaint, seeking judicial review of the final decision of USDA pursuant to the Administrative Procedures Act, 5 U.S.C. § 706, as authorized by 7 U.S.C. § 6999. Bukaske also advances a claim for declaratory relief under 28 U.S.C. §§ 2201, 2202. This court previously ruled that Bukaske may allege jurisdiction only under 7 U.S.C. § 6999. Defendants filed a motion for summary judgment.

## DECISION

[¶ 12] Pursuant to 7 U.S.C. § 6999, a final determination of the Director of the National Appeals Division of the USDA is reviewable and enforceable by any United States District Court in accordance with the Administrative Procedure Act, 5 U.S.C. §§ 701–706. The standard of review is defined by § 706 of the Administrative Procedures Act:

> To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—
>
> (1) compel agency action unlawfully withheld or unreasonably delayed; and
>
> (2) hold unlawful and set aside agency action, findings, and conclusions found to be—
>
> > (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;
> >
> > (B) contrary to constitutional right, power, privilege, or immunity;
> >
> > (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;
> >
> > (D) without observance of procedure required by law;
> >
> > (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706. Both parties contend that review here is under § 706(2)(A).

[¶ 13] This court is asked to determine whether the defendants correctly enforced the SAA under the statute and USDA regulations. Bukaske contends that the plain language of the SAA requires recapture of shared appreciation only if he paid the loan in full, ceased farming, or transferred the secured real estate. Bukaske relies upon the language in the SAA that "[t]he amount of recapture by FmHA will be based on the difference between the value of the security *at the time of disposal or cessation by Borrower of farming* [emphasis supplied] and the value of the security at the time this Agreement is entered into." The SAA, however, also provides that, if one of the contingencies did not occur within four years, Bukaske agrees to pay shared appreciation in the amount of "Fifty (50) percent of any positive appreciation in the market value of the property ... between the date of this Agreement *and either the expiration date of this Agreement or* [emphasis supplied] the date Borrower pays the loan in full, ceases farming or transfers title of the security, if such event occurs after four (4) years but before the expiration date of this Agreement."

[¶ 14] The SAA does not clearly absolve Bukaske of paying shared appreciation as he contends. If anything, the SAA is ambiguous. It is poorly drafted, as already noted. Bukaske contends that, if the SAA is ambiguous, it must be interpreted in his favor and against the drafter, the FmHA, without reference to the statutes which authorized the write-down and required the SAA. That contention must be rejected.

■ [¶ 15] The SAA must be analyzed in light of the federal statutes and regulations governing write-downs and shared appreciation agreements. *See Bennett v. Kentucky Dept. of Educ.*, 470 U.S. 656, 669, 105 S.Ct. 1544, 1552, 84 L.Ed.2d 590 (1985) ("Unlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy"). "[T]he contract we are interpreting is one in which the United States is a party, and one which is entered into pursuant to authority conferred by federal statute. The necessity of uniformity of decision demands that federal common law, rather than state law, control the contract's interpretation." *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 28, 97 S.Ct. 2490, 2493, 53 L.Ed.2d 557 (1977). *Accord United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970).

■ [¶ 16] As set forth previously, one of the debt restructuring options set forth in the Agriculture Credit Act of 1987 is the "writing down of principal and accumulated interest charges" on FmHA loans. This option was added to 7 U.S.C. 1991(b)(3)(C). PL 100–233, § 343. Section 2001 was added to Title 7 to provide, in part:

(e) SHARED APPRECIATION ARRANGEMENTS.

(1) IN GENERAL.—As a condition of restructuring a loan in accordance with this section, the borrower of the loan may be required to enter into a shared appreciation arrangement that requires the repayment of amounts written off or set aside.

(2) TERMS.—Shared appreciation agreements shall have a term not to exceed 10 years, and shall provide for recapture based on the difference between the appraised values of the real security property at the time of restructuring and at the time of recapture.

(3) PERCENTAGE OF RECAPTURE.—The amount of the appreciation to be recaptured by the Secretary shall be 75 percent of the appreciation in the value of such real security property if the recapture occurs within 4 years of the restructuring, and 50 percent if the recapture occurs during the remainder of the term of the agreement.

(4) TIME OF RECAPTURE.—*Recapture shall take place at the end of the term of the agreement, or sooner—*

    (A) on the conveyance of the real security property;

    (B) on the repayment of the loans; or

    (C) if the borrower ceases farming operations.

PL 100–233, § 353 (emphasis supplied).

[¶ 17] The regulations in force at the time Bukaske entered into the SAA, and which remain substantively similar at present, provided that:

Servicing Shared Appreciation Agreements. Recapture of any appreciation will take place *at the end of the term* of the Agreement, *or sooner if the following occurs:*

(1) On the conveyance of the real security property by the borrower . . .

(2) On the repayment of the loans;

(3) If the borrower/spouse ceases farming operations; or

(4) Five months prior to the end of the Shared Appreciation Agreement. The County Supervisor will inform the borrower by letter of the following:

    (i) The date the recapture is due.

    (ii) The borrower must select an FmHA approved appraiser from the list provided to establish the current market value of the property subject to recapture.

    (iii) The cost of such appraisal to be shared equally by FmHA and the borrower.

    (iv) The borrower must inform FmHA of the appraiser selected within 15 days from the date of the letter indicated in paragraph (b)(4) of this section.

7 C.F.R. § 1951.914(b) (emphasis supplied). Additionally, 7 C.F.R. § 1951.914(c) provided *"Procedures for Recapture at the End of Shared Appreciation Agreement* [emphasis supplied]."

[¶ 18] USDA, at all levels of review, determined that the SAA's language requires Bukaske to pay shared appreciation at the expiration of the SAA. USDA suggests that the court should give deference to the agency's interpretation, citing *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *Chevron* held that:

"The power of an administrative agency to administer a congressionally created . . . program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress." *Morton v. Ruiz,* 415 U.S. 199, 231, 94 S.Ct. 1055, 1072, 39 L.Ed.2d 270 (1974). If Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation. Such legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute. Sometimes the legislative delegation to an agency on a particular question is implicit rather than explicit. In such a case, a court may not substitute its own construction of a statutory provision for

a reasonable interpretation made by the administrator of an agency.

We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations.

*Id.* at 843–44, 104 S.Ct. at 2782.

[¶ 19] "*Chevron* deference applies when Congress has, either explicitly or implicitly, left a gap in a statute to be filled by a particular agency." *TeamBank v. McClure,* 279 F.3d 614, 618 (8th Cir.2002). There is no gap in the statute to be filled in this case. The statutes are clear and unambiguous. Further, "*Chevron* deference is generally reserved for interpretations reached through 'relatively formal' administrative procedures, such as 'notice-and-comment rulemaking or formal adjudication.'" *Id.* at 619. The opinion issued by the USDA is not, at any level, thorough and well enough reasoned to merit deference under *Chevron.* Throughout the appeals process, the agency disclaimed any authority to make a decision upon the legal claims advanced by Bukaske.

[¶ 20] *Chevron* deference to the USDA's interpretation of the statutes and regulations is not necessary here. The question remains whether such deference should be given to USDA's interpretation of the SAA. There is a split of authority whether the courts should give *Chevron* deference to an agency's interpretation of a contract in which the agency has a financial interest. The Federal Circuit holds that such deference is inappropriate. *Southern California Edison Co. v. United States,* 226 F.3d 1349, 1357 (Fed.Cir.2000).

When a party enters into a contract with the government, that party should reasonably expect to be on equal legal footing with the government should a dispute over the contract arise. If courts were generally to adopt a principle of deference to an agency's contract interpretation, such deference could lead the courts to endorse self-serving post-hoc reinterpretations of contracts that an agency might offer in the context of a litigation.

*Id.* This is so even when regulations are essentially incorporated into contracts. *Id.* at 1358. The First Circuit has also held that *Chevron* does not dictate the deference to be given to an agency's interpretation of a contract. *Meadow Green—Wildcat Corp. v. Hathaway,* 936 F.2d 601, 605 (1st Cir.1991).

[¶ 21] The Tenth Circuit held:

The principles underlying *Chevron*—that a reviewing court should defer to agency expertise on questions within the scope of the agency's Congressionally delegated powers—clearly dictate that we defer to the Commission's interpretation of such language.

*Northwest Pipeline Corp. v. Fed. Energy Reg. Comm.,* 61 F.3d 1479, 1486 (10th Cir. 1995). The D.C. Circuit likewise holds that *Chevron* "implicitly modified earlier cases that adhered to the traditional rule of withholding deference on questions of contract interpretation." *Williams Natural Gas Co. v. Fed. Energy Reg. Comm.,* 3 F.3d 1544, 1549 (D.C.Cir.1993). The Eleventh Circuit has concluded that the Tenth and D.C. Circuit holdings reflect that majority view:

*Chevron* suggests that "the institutional advantages of agencies apply to a broad range of administrative activities," and "contract interpretation . . . is sufficiently similar to statutory interpretation [that it] warrant[s] deference—especially when the interpretation involves a policy determination within the agency's statutory domain."

*Muratore v. U.S. Office of Personnel Management,* 222 F.3d 918, 922 (11th Cir.2000) (quoting Phillip G. Oldham, Comment,

*Regulatory Consent Decrees: An Argument for Deference to Agency Interpretations,* 62 U. Chi. L.Rev. 393, 399–400 (1995)).

[¶ 22] It is not necessary to determine whether to apply *Chevron* deference since, in this case, all roads lead to Rome. Although the SAA is somewhat confusing, the USDA's ruling on the agreement is without question a reasonable interpretation of the statute and regulations. The statutory basis for a SAA is very clear. Shared appreciation is due at the end of the term of the SAA, if not sooner. Based upon the published cases found by the court and the unpublished cases cited by the parties, every Article III court which has ruled upon a challenge to the government's interpretation of the SAA has ruled that shared appreciation is due at the expiration of the ten year contract period, if not sooner. *See Israel v. U.S. Dept. of Agr.,* 135 F.Supp.2d 945 (W.D.Wis.2001), *aff'd* 282 F.3d 521 (7th Cir.2002), *Stahl v. Veneman,* No. A3–01–85, 2001 WL 1820378 (D.N.D. August 22, 2001) and *Pandora Farms,* No. 00–1753–A (E.D.Va. July 5, 2001). In addition, two United States bankruptcy court decisions have concluded that the FSA correctly interpreted a SAA to provide for payment of 50% of appreciation, if any, at the end of the ten year contract term. *See In re Tunnissen,* 216 B.R. 834 (Bankr.D.S.D. 1996), and *In re Moncur,* 1999 WL 33287727, No. 98–03213 (U.S.B.C.D.Id. May 27, 1999).

[¶ 23] Bukaske relies instead on a decision of the United States Tax Court holding that discharge of indebtedness pursuant to a write-down is included in gross income. The tax court explained, in dicta, that "[i]f the contingencies do not occur within the time periods designated under the agreement, the shared appreciation agreement ends, and petitioner's only continuing obligation to the FmHA is the repayment of the new note." *Lawinger v. Commission-*

*er of Internal Revenue,* 103 T.C. 428, 431, 1994 WL 471849 (1994). That decision is entitled to no weight here since the repayment of shared appreciation under the SAA was not at issue in that case.

[¶ 24] Bukaske also contends his position is supported by the fact that the debt was not included in the marital estate by the state divorce court. The failure to include the possible shared appreciation (possibly due some years hence) in valuing the marital estate, a fact which does not necessarily appear in the divorce decree or the findings of fact and conclusions of law, does nothing to lend weight to Bukaske's interpretation of the SAA.

[¶ 25] Bukaske claims that he was mislead by the ambiguity in the SAA and the FmHA county supervisor's representations that no shared appreciation would be due if he did not pay off the restructured debt, cease farming, or sell the collateral during the ten year term of the SAA.

[¶ 26] It is a "general rule that those who deal with the Government are expected to know the law and may not rely on the conduct of Government agents contrary to law." *Heckler v. Community Health Services of Crawford County, Inc.,* 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984).

> Whatever the form in which the Government functions, anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority. The scope of this authority may be explicitly defined by Congress or be limited by delegated legislation, properly exercised through the rule-making power. And this is so even though, as here, the agent himself may have been unaware of the limitations upon his authority. *See, e.g., Utah Power & Light Co. v. United States,* 243 U.S.

389, 409, 37 S.Ct. 387, 391, 61 L.Ed. 791; *United States v. Stewart,* 311 U.S. 60, 70, 61 S.Ct. 102, 108, 85 L.Ed. 40, and *see, generally, In re Floyd Acceptances,* 7 Wall. 666, 19 L.Ed. 169 … And so Congress has legislated in this instance, as in modern regulatory enactments it so often does by conferring the rule-making power upon the agency created for carrying out its policy. *See* § 516(b), 52 Stat. 72, 77, 7 U.S.C. § 1516(b), 7 U.S.C.A. § 1516(b). Just as everyone is charged with knowledge of the United States Statutes at Large, Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents. 49 Stat. 502, 44 U.S.C. § 307, 44 U.S.C.A. § 307 … The oft-quoted observation in *Rock Island, Arkansas & Louisiana R. Co. v. United States,* 254 U.S. 141, 143, 41 S.Ct. 55, 56, 65 L.Ed. 188, that "Men must turn square corners when they deal with the Government," does not reflect a callous outlook. It merely expresses the duty of all courts to observe the conditions defined by Congress for charging the public treasury.

*Federal Crop Ins. Corp. v. Merrill,* 332 U.S. 380, 384–85, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947).

[¶ 27] Bukaske cannot prevail on his claim not to owe shared appreciation based upon misrepresentations by FmHA officials. This same claim was rejected in *Israel v. U.S. Dept. of Agr.,* 282 F.3d 521 (7th Cir. 2002). He was specifically advised in the package of materials he received in 1989 which described the availability of loan service programs for delinquent borrowers that, in conjunction with the debt write-down program, he would have to sign a shared appreciation agreement, and that:

> During this 10 years, FmHA will ask you to repay part of the debt it wrote down if you do one of the following things:

> 1) Sell or convey the real estate
> 2) Stop farming
> 3) Pay off the entire debt

> If you do not do one of these things during the 10 years, *FmHA will ask you to repay part of the debt written down at the end of the 10 years.*

FmHA Instruction 1951–S, Exhibit A to Subpart S, Attachment 1, page 5 (emphasis supplied). Bukaske claims that he did not read the materials. He failed to do so at his peril. He also claims that the materials sent were not timely, coming far in advance of his knowledge that he might be eligible for debt write-down, that they were not "meaningful" and that they were not "easily understood" by a farmer with an eighth grade education, all in violation of § 605 of the Agriculture Credit Act of 1987 and the discussion of the Act by the Senate Agriculture Committee. The packet was no doubt lengthy since it included at least 18 pages of various forms required to apply for debt restructuring. However, the language quoted is quite clear as to the requirements of paying shared appreciation for a debtor participating in the write-down program; that information is at the beginning of the packet. His claims that the materials were not easily understood or meaningful are rejected. If he had read the materials, he could perhaps advance such claims. Having made no attempt to read them or consult with an attorney, Bukaske's claims must be rejected. Bukaske does not set forth in his affidavit the date he received the debt restructuring materials and his claim that it was not timely must be rejected.

[¶ 28] Bukaske claims that the shared appreciation was improperly calculated by FSA. Bukaske claims that the shared appreciation calculation should be based, in part, on the "equity recapture account amount" which, he now claims, was required to be calculated as part of the

write-down process. According to Bukaske, the equity recapture amount which, he contends, was required to be calculated as part of his debt restructuring, would be the maximum that could be collected under the SAA. He contends that this amount would be equal to the lesser of (1) the difference between the loan balance and the net recovery value, or (2) the difference between the market value and the net recovery value. Bukaske contends that the maximum amount recoverable under the SAA, based upon an equity recapture calculation, would be $40,397.40.

[¶ 29] Although Bukaske generally contended during the administrative appeals process that the amount owed should be lower, there is no record that he ever contended before the USDA that the amount of shared appreciation due should have been calculated based upon some equity recapture amount which the FmHA had previously failed to calculate. This court's review is limited to review of the agency's decision. This issue was never properly raised in the administrative appeals process and the USDA has not had an opportunity to review the issue. This court therefore declines to address the issue. An additional basis for declining to address this issue is that Bukaske admitted (in the course of the summary judgment motion) the statement of undisputed facts set forth by the defendants to the extent that the shared appreciation due was $91,150. He merely denied that it was due. He did not set forth in his response to the statement of undisputed material facts that there was an issue of fact as to the amount due. Failure to do so precludes him from raising the claim now. D.S.D. LR 56.1.

[¶ 30] The court finds that the decision of the Director of the National Appeals Division is not arbitrary, is not capricious, is not an abuse of discretion, and is not otherwise not in accordance with law. There are no genuine issues of any material fact and defendants are entitled to judgment as a matter of law.

[¶ 31] IT IS ORDERED that defendants' motion for summary judgment (Doc. 27) is granted. Plaintiff's appeal is dismissed.